# Kuhn, Appellant, *v.* Buhl.

*Contracts—Bids for public franchises—Withdrawal of bids—Contract for withdrawal—Illegality—Evidence—Written contracts—Illegal consideration.*

1. All agreements for pecuniary considerations to control the business operations of the government are void as against public policy, without reference to the question whether improper means are attempted or used in their execution; such transactions are condemned not so much for the harm done in any particular instance, as because of their general evil public tendency.

2. Where any public right, franchise, contract or privilege is to be disposed of by government officials or agents, whether by a public letting, or awarding upon bids, or by the exercise of official discretion without public bids, public policy forbids that one competing applicant, candidate or bidder should contract for the extinguishment of another's competition, and such contracts, if made, are void.

3. Where a written contract is attacked upon the ground that it is offensive to law and violative of public policy, the substance, not the form of the agreement, is looked at; the court will not confine its attention to the mere words in which it is expressed, but evidence aliunde the contract is admissible to prove the illegality of the consideration.

4. Where the consideration of a contract is indivisible and a part is illegal, it falls as a whole.

5. Under the Acts of Congress of August 18, 1894, c. 301, Sec. 4, 28 U. S. Stat. 372, 422, (2 U. S. Comp. Stat. 1935, Sec. 4685), June 11, 1896, c. 420, 29 U. S. Stat. 413, 434, (2 U. S. Comp. Stat. 1937, Sec. 4686), and March 3, 1901, c. 853, Sec. 3, 31 U. S. Stat. 1133, 1188, (2 U. S. Comp. Stat. 1937, Sec. 4687), relating to the reclamation of desert lands owned by the United States in various states, the state wherein such lands were located, and which accepted the provisions of said acts, were given a measure of control over the reclamation and disposition of such lands, so that the same could be settled. By appropriate legislation, the State of Idaho accepted said acts and established a complete system, for carrying out their provisions, whereby it was provided, inter alia, that the selection, management and disposal of said lands should be vested in a State Board of Land Commissioners. Said board was authorized to let contracts from the state for constructing irrigation works, upon application duly filed, and was vested with exclusive authority to grant or refuse any application. Two rival applicants filed competitive proposals with the State Board of Land Commissioners, for the reclamation of certain land; the granting of one of which applications meant the refusal of the other. While such applications were pending, one of the applicants orally agreed with the other to withdraw his bid for a consideration of $300,000. A written agreement, subsequently executed in Pennsylvania, provided not that the applicant should withdraw its proposal but should sell to the other its maps, plans, surveys, estimates and interest in its application for that sum. In accordance with the verbal arrangement the proposal was withdrawn and the contract was awarded to the other applicant, who paid the party withdrawing $25,000 on account. The plans, estimates, etc., were duly delivered. In an action for the balance due under the agreement, the court admitted parol evidence to show the circumstances under which the written contract was made, ruled that the consideration was illegal and the contract void as against public policy and entered judgment for defendant. *Held*, no error.

*Practice, C. P.—Trials without a jury—Act of April 22, 1874, P. L. 109—Findings of fact.*

6. Under the Act of April 22, 1874, P. L. 109, providing for trials by a judge without a jury, it is not necessary that the court shall specifically answer upon the record all the requests for findings of fact submitted by counsel, providing the findings cover the facts stated in the requests which are material to a proper determination of the case.

Argued Sept. 29, 1915. Appeal, No. 233, Oct. T., 1915, by plaintiff, from judgment of C. P. Mercer Co., Oct. T., 1913, No. 166, for defendant, on submission to court without a jury, in case of William S. Kuhn, J. S. Kuhn, J. H. Purdy, I. B. Perrine and H. L. Hollister, for the use of Twin Falls North Side Land and Water Company, a corporation duly organized and existing under the laws of the State of Delaware, v. Frank H. Buhl. Before MESTREZAT, POTTER, STEWART, MOSCHZISKER and FRAZER, JJ. Affirmed.

Assumpsit for a payment alleged to be due under a written contract. Before WILLIAMS, P. J.

The case was tried without a jury under the Act of April 22, 1874, P. L. 109.

From the record it appeared that the case involved a consideration of the Act of Congress of Aug. 18, 1894, c. 301, Sec. 4, 28 U. S. Stat. 372, 422, commonly known as the "Cary Act" (See 2 U. S. Comp. Stat. 1935, 1937, Sections 4685, 4686, 4687), which provides, "That to aid the public land states in the reclamation of the desert lands therein, and the settlement, cultivation and sale thereof in small tracts to actual settlers," the secretary of the interior, with the approval of the president, is authorized and empowered, upon the application of any state in which there are such desert lands, to contract and agree, binding the United States to donate, grant and patent to such state free of cost such desert lands, not exceeding one million acres in any one state, as such state may cause to be irrigated, reclaimed, occupied and

in a measure cultivated by actual settlers. Any state acting under this statute is authorized to make all necessary contracts to cause the lands to be reclaimed and to induce their settlement and cultivation.

The case also involved a consideration of the laws of Idaho. By appropriate legislation enacted in the year 1899, the State of Idaho accepted the conditions of the Cary Act and established a complete system for carrying out its provisions. See Sections 1613 and 1634 of the Idaho Revised Code. In establishing or assigning the jurisdiction over the subject, Section 1613 provides as follows: "The selection, management and disposal of said land shall be vested in the State Board of Land Commissioners, as constituted by Section 7, of Article IX, of the Constitution of the State of Idaho." This section of the Constitution is as follows: "The governor, superintendent of public instruction, secretary of state and attorney general shall constitute the State Board of Land Commissioners, who shall have the direction, control and disposition of the public lands of the state, under such regulations as may be prescribed by law." The laws of Idaho do not authorize the construction of irrigation works by the state itself, but provide for the construction of such works by individuals, companies of persons, associations or corporations, by contract with the state, and under state supervision. The proceedings by which individuals, companies or corporations may obtain contracts from the state for constructing irrigation works for the reclamation of desert lands under the Cary Act and the laws of Idaho, as stated, are fully prescribed by these statutes. The manner of instituting such proceedings is set forth in Section 1615 of the Idaho Code. The first step is the filing with the Board of Land Commissioners of a request by the applicant for the segregation, or setting aside, of the particular lands designated by the applicant for reclamation, and this request must be accompanied with a proposal on the part of the applicant to construct the irri-

gation works necessary for the complete reclamation of the designated lands. The statutory requirements of the applicant's request and proposal are as follows: "The proposal shall be prepared in accordance with the rules of the Board of Land Commissioners, and with the regulations of the U. S. Department of the Interior. It shall be accompanied with the certificate of the state engineer that an application has been filed in his office for a permit to appropriate water, together with the state engineer's report thereon. It shall state the source of the water supply, the location and dimensions of the proposed works, the estimated cost thereof, and the price and terms per acre at which perpetual water rights will be sold to settlers on the land to be reclaimed, the perpetual water rights to embrace a proportionate interest in the irrigation works, together with all the rights and franchises attached thereto. If the applicant is a corporation, there shall be set forth the name of the company, the purpose of its incorporation, the names and places of residence of its directors and officers, the amount of its authorized and of its paid up capital. If the applicant is not a corporation, the name or names of the party or parties applicant shall be given, together with such facts as will enable the board to determine his or their financial ability to carry out the proposed undertaking. The request and proposal must be accompanied with a certified check for not less than $250 nor more than $2,500 as may be determined by the rules of the board, as a guaranty of the execution of the contract by the applicant in accordance with his request and proposal, in case of the approval of the same by the state, the check to be forfeited to the state in case of the applicant's failure to enter into such contract. The applicant shall have filed with the state engineer an application for a permit to appropriate water for the reclamation of the lands described in the request to the board, this application to be of a form prescribed by the state engineer, and accompanied by two copies of a map

of the land to be selected, showing accurately the location and dimensions of the proposed irrigation works, and prepared in accordance with the regulations of the state engineer's office and the rules of the U. S. Department of the Interior."

Article XV of the Constitution of Idaho declares the use of the waters of the state to be a public use, and that the right to collect rates for the same is a "franchise."

When the application is in proper form, it is submitted to the state engineer to examine and make a written report thereon to the Board of Land Commissioners, upon the following points, viz: "Whether the proposed works are feasible. Whether the proposed diversion of the public waters of the state will prove beneficial to the public interest. Whether there is sufficient unappropriated water in the source of supply. Whether or not a permit to divert and appropriate water through the proposed works has been approved by him. Whether the capacity of the proposed works is adequate to reclaim the land described. Whether or not the proposed cost of construction is reasonable. Whether or not the maps filed in his office comply with the requirements of said office and the regulations of the U. S. Department of the Interior. Whether the lands proposed to be irrigated are desert in character and such as may properly be set apart under the provisions of the Act of Congress and the rules and regulations of the U. S. Department of the Interior thereunder."

When the state engineer has made his report on any application, the report is laid before the State Board of Land Commissioners for its consideration. If the application is approved by the board, a request is filed with the U. S. Land Office for the segregation or withdrawal of the lands covered by the application, and when the lands are so withdrawn by the U. S. Department of the Interior, it is made the duty of the Board of Land Commissioners to enter into a contract with the applicant, which contract shall contain complete specifications of

the location, dimensions, character and estimated cost of the proposed ditch, canal or other irrigation works, the price and terms per acre at which such works and perpetual water rights shall be sold to settlers, and the price and terms upon which the state is to dispose of the lands to settlers. The applicant is required to give a bond conditioned for the faithful performance of the provisions of his contract with the state. For the benefit and security of applicants who contract with the state, the statutes provide that the lands irrigated shall be disposed of by the state only to purchasers of water rights from the contractor, and a lien is given the contractor for the amount due him under any sale of water rights, both upon the water rights sold and the land itself.

The whole power and authority to grant or refuse any application is vested exclusively in the State Board of Land Commissioners, but it is provided by Section 1619 of the Idaho Code, that no application shall be approved on which the state engineer has reported adversely upon any of the following matters, viz: "The sufficiency of the water supply, the feasibility of the construction, the cost or capacity of the works, and the character of the lands." It is expressly directed, however, by Section 1620 that, if the state engineer reports adversely upon any application, the Board of Land Commissioners shall notify the applicant of such action and the reasons therefor, and that the applicant shall then have sixty days in which to submit a satisfactory proposal.

The foregoing is a summary of the constitutional provisions, statutes, rules and regulations governing the irrigation and reclamation of desert lands in the State of Idaho, "and the settlement, cultivation and sale thereof in small tracts to actual settlers," that were in force at the time of the agreement in suit.

The following, with some immaterial eliminations, are the facts as formally found by the court below: That in the making of the contract in suit, and in all of the

negotiations leading up to the same, F. H. Buhl, the defendant, acted for and as the representative of the Twin Falls Land and Water Company, a corporation of which he was the president, and not for himself individually, and on August 10, 1908, that company expressly ratified and approved the agreement as made by Mr. Buhl. That the first installment of $25,000.00 on the purchase-money called for by the written contract was paid by the Twin Falls Land and Water Company, and this amount covered and recompensed the plaintiffs for all their expenditures in connection with their application, including the value of their permits, maps, plans, surveys and estimates. That the two applications and proposals of the plaintiffs and the Twin Falls Land and Water Company to the Idaho State Board of Land Commissioners, for the segregation of, and the right under a subsequent contract with the state to irrigate and reclaim, the Bruneau Desert Lands, were competitive and rival applications for the same public right or franchise, and the granting of either application would necessarily mean the refusal, and consequent extinction, of the other. That these two applications and proposals differed from each other materially as to the quantity of land to be irrigated and reclaimed, the plan, construction, extent, and cost of the irrigation works, and the price per acre at which perpetual water rights and proportionate interests in the irrigation works would be sold to settlers; the plaintiffs' proposal as to this last item being five dollars per acre lower than the Twin Falls Land and Water Company's proposal. That at the time the contract between the plaintiffs and the defendant was agreed upon at Sharon, Pa., viz., July 30, 1908, these two applications and proposals were both pending and undetermined before the State Board of Land Commissioners of Idaho, and said board had already fixed a date in the near future for an official meeting of the board for consideration thereof upon their respective merits. That the purpose which all parties to the contract in suit had in view,

throughout their negotiations, was to bring about the grant of the Twin Falls Company's application for segregation, by the Idaho State Board of Land Commissioners, by means of the elimination of the plaintiffs' competitive application, and the $300,000 which the defendant agreed to pay to the plaintiffs was nearly all, if not wholly, in consideration for the plaintiffs' participation in this object and purpose. That the covenant of the plaintiffs to sell to the defendant its permits, maps, plans, surveys and estimates was not the chief purpose of the written contract, but merely an incident thereto, the chief purpose being the elimination of the plaintiffs' application for segregation, then pending before the Idaho State Board of Land Commissioners, in order to bring about the granting by the said Board of the Twin Falls Company's rival application for the same public rights and franchises. That the contract between the parties, as made and agreed upon verbally, was for the absolute withdrawal of the plaintiffs' application then pending before the State Board of Land Commissioners of Idaho, and, on July 30, 1908, the day the contract was agreed upon verbally, it was mutually arranged that this withdrawal should take place at a meeting of the said board, to be held at Boise, Idaho, on August 10, 1908, which was six days after the written contract was executed. That the inducement which led the defendant to execute the written contract was the agreement of the plaintiffs to appear before the land commissioners of Idaho and withdraw their application for segregation, and it was upon the faith of this agreement that the defendant executed said contract. That in pursuance of their agreement so to do, three of the legal plaintiffs, acting for themselves and their associates, appeared before the land commissioners of Idaho, at a meeting held in Boise, Idaho, on August 10, 1908, and then and there publicly withdrew their application for segregation. That the object and purpose of the plaintiffs in withdrawing their application for segregation was to induce

and bring about the granting of the Twin Falls Company's like application, and thereby fix the liability of the defendant to pay to the plaintiffs the sum of $300,000 as provided by the terms of the written contract in suit; but the representative of the plaintiffs who addressed the meeting of the land commissioners at the time of the withdrawal of the application merely stated that an arrangement had been made with Mr. Buhl (the defendant) by the Kuhn interests (which meant the legal plaintiffs), by which plaintiffs' maps, filings, rights or priorities were to be transferred to Mr. Buhl, and in explanation of why plaintiffs were withdrawing their application for segregation he assigned but one reason, and that was that the Kuhn interests were already engaged in a great many large enterprises there, and had about as much as they could handle for the next two or three years.   That immediately upon, and as a direct result of, the withdrawal of the plaintiffs, the Board of Land Commissioners granted the Twin Falls Company's application for segregation by the adoption of the following minute, viz: "The Twin Falls Land and Water Company's proposal, dated June 3, 1908, for the segregation of about 380,000 acres of land, lying between the Salmon and Bruneau rivers, in Owyhee County, Idaho, this being the only proposal for said lands now before the board, it is ordered that said company be granted these lands and that it be allowed to amend its proposal, including more lands which may be susceptible of irrigation under such system, and that the state engineer make a further and separate report upon said system." That at the time of the withdrawal of plaintiffs' application and the granting of the Twin Falls Company's application, the Board of Land Commissioners had no notice or knowledge of the written contract in suit, or of the fact that the plaintiffs were to receive $300,000 or any other sum of money from the defendant in consideration of the withdrawal or other use or manipulation of plaintiffs' application, for segregation so as to bring about the

granting of the Twin Falls application, and neither the said board in its official or organized capacity, nor any individual member thereof, had any knowledge of the true nature of the agreement then existing between the plaintiffs and the defendant, or of the amount of the consideration which the defendant was to pay to the plaintiffs. That, while no official vote or action had been taken by the State Board of Land Commissioners upon the comparative merits of the two applications and proposals of the plaintiffs and the Twin Falls Company for the segregation, irrigation and reclamation of the Bruneau Desert Lands before the withdrawal of the plaintiffs' application and proposal, the distinctive features and merits of the two rival applications and proposals had been considered and discussed by the members of the board in an informal way, and they were equally divided in opinion as to which application and proposal should receive favorable action.

One member of the land board testified: "Q. And you knew that if both of those applications or proposals remained undisposed of or not withdrawn, that the duty was going to be imposed upon the board of deciding which one should have it, you knew that, didn't you? A. I knew that, yes. Q. And you knew that you were going to have to determine, or take into consideration, the difference between the plans and the specifications proposed by each one of these parties respectively? A. Yes, sir. Q. And you knew that you were going to have to take into consideration the question of which was the best calculated to irrigate the lands at the least cost to the settler, you knew that? A. Yes, sir. Q. And you knew you were going to have to take into consideration the number of acres that each enterprise was going to redeem and water? A. Yes, sir. Q. And you knew you were going to have to take into consideration the price at which the contractor would ultimately sell the water and water rights, or the water rights to the settlers, that is right, isn't it? A. We didn't have to do that at that

time.  Q. But you knew that ultimately you were going to have to do it?  A. Certainly.  Q. That those were elements you were going to take into consideration?  A. Yes, sir.  Q. You also recognized the fact that those parties were competitive applicants for the construction of a system to redeem and water these lands, didn't you? A. In a certain sense." Another member testified: "Q. Did you think that those were competitive propositions? A. They were.  Q. You told Mr. Edwards, I believe, that during the time you were a member of the land board there were two contests, two pieces that came before the land board, in which there was an apparent contest between applicants for the segregation, did you not?  A. I think there was two, but possibly more.  Q. And you told him that in cases where the standing of the applicants was both good with regard to their financial ability, and the character of the work which they were going to construct, that the price named in their proposal was a consideration with the land board?  A. Yes, sir."  A third member testified: "Q. So that you considered the Kuhn application was the most advantageous to the interest of the state?  A. I think so.  I naturally would consider the amount of acreage to be reclaimed.  Q. And you looked upon it in that light up to the time that you received information that the Kuhn application was to be withdrawn, did you not?  A. Yes, sir.  Q. And also looked upon it in that light until the Kuhn application was in fact withdrawn?  A. Yes, sir."  One of the plaintiffs testified: "Q. Now, for what purpose were you and Mr. Buhl to attend this meeting?  A. To explain to the land board the fact that we desired Mr. Buhl to be placed in our position; that is, that there were not going to be two contending forces in the requests that are usually to be made in all the preliminary steps of getting a segregation."

The court entered judgment for defendant. Plaintiffs appealed.

*Errors assigned* were in dismissing exceptions to rulings on evidence, and to various findings of fact and conclusions of law, and the judgment of the court.

*George B. Gordon,* with him *T. C. Cochran, S. A. Gilmore* and *Sidney J. Watts,* for appellants.—The contract on which the suit was brought in this case is a legal and valid contract: Morrison v. Darling, 47 Vt. 67; Shaw v. Elijah, 102 N. E. Repr. 885; Hardesty v. Service, 45 Kans. 614, (26 Pac. Repr. 29); McCabe v. Caner, 68 Mich. 182, 36 N. W. Repr. 901; Murray v. White, 42 Mont. 423, (113 Pac. Repr. 754); Macy v. Sunderman, 15 N. Mex. 372, (110 Pac. Repr. 511); Tecumseh State Bank v. Maddox, 4 Okla. 583, (46 Pac. Repr. 563); Caldwell v. Ruddy, 2 Idaho 5, (1 Pac. Repr. 339); Waring v. Loomis, 35 Wash. 85, (76 Pac. Repr. 510); Lamb v. Davenport, 85 U. S. 307; Dohr v. Wolfgang, 151 Wis. 95, (138 N. W. Repr. 95); Love v. Flahive, 205 U. S. 195; Montana Mining Co. v. St. Louis Mining & Milling Co., 51 Pac. Repr. 824; Hyer v. Richmond Traction Co., 168 U. S. 471; Valdes v. Larrinaga, 233 U. S. 705; Hyer v. Richmond Traction Co., 80 Fed. Repr. 839.

The contract in this case was made in Pennsylvania and its legality must be determined by the law of Pennsylvania: Rumsey v. New York & Penna. R. R. Co., 203 Pa. 579; 9 Cyc. 582; Snyder v. Liebengood, 4 Pa. 305; Carey v. Mackey, 82 Me. 516, (20 Atl. Repr. 84).

It was not competent for the defendant to offer evidence to show the prior negotiations which led up to the written contract, or to show that the contract, valid upon its face, was contrary to public policy: Irvin v. Irvin, 169 Pa. 529, 32 Atl. Repr. 445; Baugh's Executors v. White, 161 Pa. 632, 29 Atl. Repr. 267; Van Voorhis v. Rea, 153 Pa. 19, 25 Atl. Repr. 800; Halberstadt v. Bannan, 149 Pa. 51, 24 Atl. Repr. 83; Rearick v. Rearick, 15 Pa. 66; Fisher v. Deibert, 54 Pa. 460; Litle v. Hender-

son, 2 Yeates 295; Thomas v. Loose, 114 Pa. 35, 6 Atl. Repr. 326.

*Q. A. Gordon,* with him *James P. Whitla, H. C. Edwards* and *J. N. Martin,* for appellee.—The natural tendency of the agreement in suit is to injuriously influence the public interest; it is against public policy and the law will refuse its aid to either party, either to enforce that which is executory, or to undo that which has been executed; it will leave the parties where it finds them: Pittsburgh v. Goshorn, 230 Pa. 212; Atcheson v. Mallon, 43 N. Y. 147; McMullen v. Hoffman, 174 U. S. 639; Providence Tool Co. v. Norris, 69 U. S. 45; Trist v. Child, 88 U. S. 441; Gibbs v. Smith, 115 Mass. 592; Gulick v. Ward & Bailey, 10 N. J. (Law) 87; Kennedy v. Murdick, 5 Harrington (Del.) 458; Swan v. Chorpenning, 20 Cal. 182; Ray & Whitney v. Mackin, 100 Ill. 246; Sharp v. Wright & McDonald, 36 Barb. (N. Y.) 236.

The case is distinguishable from Irvin v. Irvin, 169 Pa. 529, relied upon by the appellants.

OPINION BY MR. JUSTICE MOSCHZISKER, January 3, 1916:

This case was tried in accordance with the Act of April 22, 1874, P. L. 109, by a judge without a jury; the action was in assumpsit, the plaintiffs claiming $275,000 under a written contract. After receiving evidence of the steps leading up to what the trial judge found to be the agreement in question, also concerning the conduct of the parties at the time of, and immediately after, the execution of the writing sued on, the court below concluded that the contract was void as against public policy, and entered judgment in favor of the defendant; the plaintiffs have appealed.

The material facts in the case as found by the trial judge are given more at length in the notes of the reporter published in connection herewith; but, so far as

necessary to develop the principles involved, they may be more briefly stated thus: Under what is known as the "Cary Act," the State of Idaho was granted authority to control, to a certain extent, the public lands of the federal government within the confines of that Commonwealth. In pursuance of this authority, the general assembly of Idaho established a system for carrying out the provisions of the federal statute, and the parties to the present controversy proceeded under this legislation. A State Board of Land Commissioners was constituted, consisting of four members, and this board was authorized to pass upon all applications, or proposals, for the segregation of public lands for purposes of irrigation and subsequent sale to settlers. The Idaho statute does not authorize the reclamation of the lands through irrigation by the state itself, but provides for the doing of this by others, under a contract with the state. In order to obtain a contract to do such work, one has to file with the Board of Land Commissioners an application, or proposal, setting forth certain details prescribed in the statute, and this must be accompanied by a certified check "for not less than $250 and not more than $2,500 ......as a guarantee of the execution of the contract by the applicant in accordance with his request and proposal in case of the approval of the same by the state." On March 14, 1908, the five legal plaintiffs in this case filed a request for the segregation of, and proposal to irrigate and reclaim, approximately 600,000 acres of desert land. On June 3, 1908, the Twin Falls Land and Water Company, a corporation, filed a like request and proposal for about 380,000 acres of the same lands included in the application of the plaintiffs. Frank H. Buhl, the defendant, was the president of the Twin Falls Company, and, in all the subsequent dealings hereinafter referred to, acted for that corporation. On June 22, 1908, at one and the same time, the land commissioners ordered an examination of both applications. While the applications in question covered, in whole or in part, the same

lands, the proposals differed in several particulars, viz: in the source of the water supply and the points where the waters were to be diverted, in the plan or system of irrigation and cost thereof, and finally, in the fact that the plaintiffs proposed to "sell water rights and proportionate shares in the completed irrigation works to settlers at $45 per acre, payable $3 per acre at the time of sale, and the balance in not less than ten equal annual installments, while the proposal of the Twin Falls Company was to sell the same water rights and proportionate shares to settlers at $50 per acre, to be paid in five equal annual installments, with interest on the deferred payments at the rate of 6 per cent. per annum." Both the Kuhn interests (represented by the plaintiffs) and the Buhl interests (represented by the defendant) had been engaged within the State of Idaho in irrigation projects for some years, and the state officials were anxious to retain the active participation of each of these groups in this field of endeavor. In the latter part of July, 1908, when the two applications were pending before the State Board of Land Commissioners, one of the legal plaintiffs came to Pennsylvania for the purpose of conferring with the defendant relative to their rival proposals. After several talks, on July 30, 1908, at East Sharon, Pennsylvania, an agreement was reached that Mr. Buhl, acting for the Twin Falls Company, should pay $300,000 to the plaintiffs, and that the latter should formally appear before the land commissioners in Idaho and withdraw their pending application, thus leaving the field open to the defendant and the interests which he represented to secure the sought-for irrigation rights.

In pursuance of the agreement as just stated, on August 4, 1908, the written contract in suit was prepared and executed, and six days thereafter the parties appeared at a meeting of the land commissioners in Idaho, which had been arranged for the purpose, and the plaintiffs' proposal was formally withdrawn. In making this withdrawal a representative of the plaintiffs addressed

the commissioners and assigned as a reason for abandoning their application that his people were engaged in a great many large enterprises within the State of Idaho, and, therefore, felt that they had about as much as they could handle for the next two or three years. The written contract between the parties did not stipulate the formal withdrawal of plaintiffs' application, but it provided that, for a consideration of $300,000, the plaintiffs should sell and transfer to the defendant all their interest therein, and also "all maps, plans, surveys and estimates made by or for them in connection with the segregation or irrigation of the lands referred to in said application," adding, "such assignment to be made in the event that the said Frank H. Buhl or his associates shall be able to procure the segregation already applied for by him"; it further provided that $25,000 of the consideration mentioned must be paid to the plaintiffs "ten days after the State Land Board of Idaho should formally signify their intention to recommend the segregation (of the lands in question) to the party of the second part and his associates (being the defendant and the interests he represented)." The fact of the existence of this written contract was not made known to the board of land commissioners, nor was anything said at the meeting concerning the consideration called for therein. The minutes of the meeting show the withdrawal of the plaintiffs' application "for the segregation of about 600,000 acres of land," and the granting of the defendant's application for "about 380,000 acres," with the right to the Twin Falls Company to amend its proposal by including more land, it being expressly stated, after noting the withdrawal of the plaintiffs' proposal, that the application of the defendant was "the only proposal for said lands now before the board." Immediately after this meeting of the land board, the Twin Falls Company held a meeting and authorized the payment of the $25,000 stipulated for in the written agreement, and this sum was subsequently handed to the legal plaintiffs. When

the time fixed in the contract for the payment of the balance, or $275,000, arrived, it was not forthcoming, and the plaintiffs instituted the present action to recover the amount with interest.

The plaintiffs contend, as they did in the court below, that the sought-for grant was not a franchise, that there was no competitive situation, and therefore, the contract in suit was in no sense harmful to the public; that the balance of the $300,000 named in the written agreement was due to them as a consideration for the assignment and transfer to the defendant of the maps, plans, surveys and estimates mentioned therein, together with any interest which they might have, or be entitled to claim, under their application, which was filed more than two months prior to that of the defendant's company; that, since their application was filed before the proposal of the defendant, it was prior in time, and hence prior in right, and for that reason it had a value which (like a location or entry upon lands under the homestead and other such laws) they had a legal right to realize upon by sale or otherwise; that if their interest in this application had no substantial value which could be disposed of by sale, still, since the transfer of tangible property, i. e., maps, plans, etc., was provided for in the agreement, that was sufficient to support the consideration and carry the contract; and finally that, since the writing was valid upon its face, and the plaintiffs were not obliged to prove any facts aliunde the written contract in order to establish their case, the defendant should not have been permitted to introduce oral evidence of the negotiations leading up to the making of the contract or concerning the subsequent actions of the parties in interest, and thus to attack its validity. Further, the appellants complain because the court below did not answer specifically their requests for findings, and they contend that, owing to this failure, many material facts were not passed upon or given effect. On the other hand, the defendant contends, as he did below, that the

real purport and purpose of the written agreement, and the actual value contemplated to be delivered for the $300,000 therein provided to be paid, were the elimination and withdrawal of the application, or proposal, filed by the legal plaintiffs, in order that the field of competition might be cleared and the proposal of the Twin Falls Company (represented by the defendant) granted without opposition.    The court below did not sustain any of the contentions of the plaintiffs, but found in favor of the defendant, saying, "The fact that the subject of the contract in suit, and the thing for which the defendant agreed to pay the $300,000 claimed, was the withdrawal and entire elimination of the legal plaintiffs as competitors of the Twin Falls Land and Water Company before the State Board of Land Commissioners of Idaho, for a contract with the state to carry out the Bruneau irrigation project, is so conclusively shown and firmly established by the evidence in this case that no contrary theory can be entertained."

The manifest purpose of the legislation referred to in the beginning of this opinion, and stated more at large in the reporter's notes to this case, was to encourage and promote the reclamation of public desert lands, to the end that they might be distributed in small tracts among actual settlers upon the cheapest and most inviting terms, so as to bring about their ultimate ownership, occupation and cultivation by the largest possible population; and the fact that, in effect, the ownership of the irrigation works also would eventually pass to these settlers, cannot affect the character of the original grant as a public franchise, if it was such.    In the present case, official responsibility, to work out the contemplated results, was placed upon the Idaho State Board of Land Commissioners, and, the laws upon the subject being complied with, they had the right, and were fixed with the duty, when the occasion should arise, of deciding which of two or more applications, or proposals, for irrigating any given district, should be granted; of

course, in exercising this power, the board would be obliged ultimately to contract with the applicant who offered, or was willing to accept, the terms which promised most to the eventual settler upon the land. The mere fact that the statutes involved do not expressly provide for the manner of determining cases where more than one application is presented for the same general district, does not preclude such a situation, or alter the plain duty of the board when it arises, as it did in the present case.

Here each proposal was to irrigate and reclaim desert lands under a contract with the State of Idaho, and we feel that this constituted an application for a privilege in the nature of a public franchise. The law is established that, where any public right, franchise, contract or privilege is to be disposed of by government officials or agents, whether by a public letting or awarding upon bids, or by the exercise of official discretion without public bids (Hunter v. Nolf, 71 Pa. 282; Gulick v. Ward & Bailey, 10 N. J. (Law) 87; Boyle v. Adams, 50 Minn. 255), it is against public policy for one competing applicant, candidate or bidder to contract for the extinguishment of another's competition: Greenhold on Public Policy, Rule 172, page 178; Kennedy v. Murdick, 5 Harrington (Del.) 458; Swan v. Chorpenning, 20 Cal. 182; Ray & Whitney v. Mackin, 100 Ill. 246; and other authorities, infra. It was the duty of the board of land commissioners to receive the applications and proposals of all persons desiring to compete for the present privilege, franchise, or contract, and after a careful investigation to grant that particular application which in the judgment of the board, all things being considered, was most advantageous to the public, without regard to the priority in date of one over others; for there is nothing in the statutes upon the subject recognizing any right gained by priority of filing. This is as it should be, because, there is no true analogy between the taking up of land under the homestead and other such laws and a case

like the one before us; there the terms of the bargain are absolutely determined in advance, and all must accept the government grant on these fixed terms, while here they are largely subject to negotiations between the applicants and the State, the terms of the final bargain to be reduced to a contract for the benefit of the public, i. e., the eventual settlers upon the land. Under the circumstances and evidence at bar, the court below properly found that the plaintiffs and defendant (the latter representing the Twin Falls Land and Water Company) were competing applicants for a public franchise. Both applicants prepared their respective proposals in accordance with the statutory requirements and submitted them to the land board for its consideration and decision upon their ultimate relative merits, and this created a competitive situation; which fact was clearly recognized by at least one of the plaintiffs and several of the land commissioners, as shown by excerpts from their testimony reproduced in the reporter's notes. The two rival proposals were pending and undetermined before the land board when the agreement in suit, stigmatized by the trial court as a corrupt contract for the sale and elimination of the plaintiffs' competition, was entered into.

While we shall not stop to analyze the proofs, yet, we agree with the court below it clearly appears that the chief aim and purpose of the agreement between the parties were to eliminate the plaintiffs' actual and threatened competition, and that the consideration of $300,000, named in the written contract, was to be paid chiefly to accomplish this end, the sale of the maps, etc., being merely incidental to the prime purpose in view. In considering the effect of such a state of affairs, it is of no significance that the land board is not required to grant any particular application, but has the power to refuse all proposals submitted to it; neither is it of any consequence that the applications in question were preliminary in their nature and would not in them-

selves amount to a contract with the state, even if granted. No matter what the usual practice was before the land board, or what were the views of certain of its members, it will not do to depreciate or underestimate the importance of these preliminary proposals, for they are provided for with the greatest detail in the written law and must be viewed seriously; the mere fact that the board can permit their amendment and dictate the terms of the final bargain, without regard to the figures in the initial proposals, only makes possible a greater degree of competition when two or more applicants are seeking a particular grant. As just said, the proceedings are statutory, and applications such as here filed are expressly prescribed as the first step necessary to be taken. Every one desirous of entering upon a project like the one contemplated at bar must take this first step, and he can take no other until that is done; therefore, competition begins as soon as two applications are filed with the land board, and the suppression of this situation by an agreement between the applicants is as illegal at one stage of the proceedings as at another.

The court below has found that, at the time the plaintiffs withdrew their application, the land board was ignorant concerning the terms of the bargain between the competitors, but, if all the facts had been known, that would not legalize the transaction. The fraud was not against the land board, but the public, and even though the remaining application were, in fact, the better of the two, that would not be decisive of the case, for such transactions are condemned not so much for the harm done in any particular instance as because of their general evil public tendency. While we have not been referred to a case, and our own research has not disclosed any, which on its material facts is precisely like the one at bar, yet, the law upon the general subject in hand is firmly established, and the relevant applicable principles are well stated in the following excerpts from the authorities: "Where a contract belongs to a class

which is reprobated by public policy, it will be declared illegal though in that particular instance no actual injury may have resulted to the public, as the test is the evil tendency of the contract and not its actual result": 15 Am. & Eng. Encyc. of Law (2d Ed.), 934. "In other words its validity is determined by its general tendency at the time it is made, and if this is opposed to the interests of the public it will be invalid, even though the intent of the parties was good and no injury to the public would result in the particular case. The test is the evil tendency of the contract and not its actual injury to the public in a particular instance": 9 Cyc. 481-2. "In the absence of any legislative prohibition of a particular agreement which may be brought before a court, the latter, to declare it void on this ground, must find that such contracts have a tendency to injure the public —are against public good, or inconsistent with sound policy and good morals as to the consideration or thing to be done": 9 Cyc. 482. "Whether a contract is against public policy is a question of law for the court to determine from all of the circumstances in each case. It is clearly to the interest of the public that persons should not be unnecessarily restricted in their freedom to make their own contracts and agreements, therefore they are not to be held void as being contrary to public policy unless they are clearly contrary to what the legislature or judicial decision has declared to be the public policy, or they manifestly tend to injure the public in some way. On the other hand the interests of the public do require that there shall be some restrictions on the freedom of persons to enter into contracts; and if an agreement binds a party to do or not to do anything, the doing or omission of which is manifestly injurious to the public interests, the courts must declare it contrary to public policy, and therefore illegal and void": 9 Cyc. 483-5. In Providence Tool Co. v. Norris, 69 U. S. 45, 56, the rule is stated thus: "All agreements for pecuniary considerations to control the business operations of the

government......are void as against public policy, without reference to the question whether improper means are attempted or used in their execution; the law looks to the general tendency of such agreements and closes the doorway to temptation by refusing them recognition." In Ormerod v. Dearman, 100 Pa. 561, 564, we state that the authorities "establish the principle that contracts which have for their subject-matter any interference with the creation of laws or their due enforcement are against public policy and therefore void"; and in Swing v. Munson, 191 Pa. 582, 588, we say that "in enforcing a policy in the interests of the whole public, the law takes but little note of the conduct of the immediate parties to the contract; the rule is, that courts having in view public interests, will not lend their aid to the enforcement of an unlawful contract." Again, in the recent case of Pittsburgh v. Goshorn, 230 Pa. 212, 227, we say: "What results to a contract against public policy is a total and irremediable paralysis, which leaves it absolutely without any force or effect whatever, so that it cannot, under any circumstances, be made the basis of a cause of action. The law when appealed to will have nothing to do with it, but will leave the parties just in the condition in which it finds them." See also the discussion on this subject in Enders v. Enders, 164 Pa. 266, at p. 271; McMullen v. Hoffman, 174 U. S. 539; Gibbs v. Smith, 115 Mass. 592; Atcheson v. Mallon, 43 N. Y. 147. These principles, when applied to the facts found by the trial judge, fully justify the legal conclusion reached in this case; but, after distinguishing one alleged controlling authority cited by the appellants, we shall examine some other reasons urged by them against the validity of the judgment entered by the court below.

Irvin v. Irvin, 169 Pa. 529, largely relied upon by the appellants to sustain their contention that the sale of the maps, plans, etc., mentioned in the written agreement was sufficient to sustain the contract in suit, has no ap-

plication, in that respect, to the present case.   The gist
of the Irvin decision is simply that, where a written con-
tract is upon its face free from any taint of illegality, an
accompanying collateral parol agreement, although
against public policy, which does not actually enter into
the substance of the written contract, cannot be intro-
duced to defeat the latter.   A reading of the opinion in
that case will show we regarded the written contract
there at issue as a transaction which stood by itself,
separate and apart from the alleged collateral agree-
ment, and this is made additionally plain when the deci-
sion in question is considered in connection with Kil-
born v. Field, supra.   The present case differs from Ir-
vin v. Irvin, supra, for here the illegal agreement of the
plaintiffs to sell their competition was not incidental to
the transfer of something else, but entered into the very
essence of the transaction before us; in other words, the
written contract at bar had no real foundation to stand
upon when separated from the illegal parol agreement
that the plaintiffs and the defendant were to appear to-
gether before the State Board of Land Commissioners,
and the former were, then and there, formally to with-
draw their application and leave the field open to the
latter (which was done).   The two agreements were in
no way inconsistent, but entirely in harmony with each
other and had in view the same result, namely, the with-
drawal of the application of the plaintiffs and the grant-
ing of the application of the defendant, and upon the ac-
complishment of this result depended the payment of
the consideration.   In the Irvin case the defendant un-
dertook to set up an independent, collateral and illegal
agreement concerning a subject not mentioned or hinted
at in the written agreement, while in the present case
the written contract by its very terms provided that no
formal transfer of tangible property should take place,
and that the first installment of the consideration, viz.,
$25,000, should not be paid until the land board favora-
bly acted upon the defendant's application; which, of

course, could mean only that the application of the plaintiffs would then cease to have any value, and probably, since the two irrigation plans were different in many respects, although covering practically the same territory, the maps, plans, etc., would then be greatly depreciated in value. The plaintiffs, however, received the $25,000, and the court below has found that the amount was sufficient to compensate and reimburse them for their entire investment in connection with the subject-matter of the contract in suit; although, in this connection, it may be stated that the consideration was indivisible, there being no stipulation, either verbal or written, and no agreement, as to how much of the $300,000 named in the contract should go to the plaintiffs for giving up their application, and thus relinquishing their competition, or as to the amount to be paid them for the maps, plans, surveys, etc. It is settled that where the consideration of a contract is indivisible, and a part is illegal, it falls as a whole: Trist v. Child, 88 U. S. 441; Meguire v. Corwine, 101 U. S. 108, 112; Hazleton v. Sheckells, 202 U. S. 71, 78.

As to the appellants' complaint concerning the admission of evidence aliunde the contract. The rule is established that, "where a written instrument is attacked upon the ground that the contract is offensive to law and violative of public policy, the whole transaction should be inquired into, and the court will not suffer itself to be embarrassed by any technical rules regarding the admissibility of evidence": 21 Am. & Eng. Encyc. (2d Ed.) 1099; also see 9 Cyc. 562, where it is said that, in such instances, "the substance, not the form, of the agreement is looked at......, therefore, in order to arrive at the substance of it, the court will not confine its attention to the mere words in which it is expressed," and page 766, to this effect: "Where a contract is assailed on the ground that it is illegal and void, the defense may be and generally is established by evidence aliunde." See also Coverly v. Terminal Warehouse Co., 70 N. Y.

Supreme Ct. App. Div. 82, 88; s. c. 85; idem 488; Greenhood on Public Policy, 126. Speaking of the rule just cited, in Irvin v. Irvin, 169 Pa. 529, at p. 544, we said: "A distinction has been taken between those contracts in which the consideration affects only the parties, and those in which it affects the public......; so, while the rule laid down in Evans v. Dravo, 24 Pa. 62, and Swan v. Scott, 11 S. & R. 155, and other cases, is that a demand on an illegal transaction will be enforced, if the plaintiff can make out his case without disclosing the illegality, that rule has not been invariably applied to contracts' where the illegal consideration is......an immorality detrimental to the public. In such cases, the courts may overlook the parties and consider the question one of public policy." See also Kilborn v. Field, 78 Pa. 194, 196, where suit was brought on a note which was perfectly good on its face, but the court received evidence to show a prior accompanying agreement concerning the procuring of a divorce, which was void as against public policy, and then held: "If the consideration of the note sued upon was in part or in whole that the respondent should not appear and oppose the divorce, the note was void; whether such was the consideration was a question of fact which ought to have been submitted to the jury." Before leaving this branch of the case, it may be well to state we are not persuaded that the contract being one which concerned property located in a foreign jurisdiction, has any weight under the circumstances in this case. The contract was made and executed in Pennsylvania, and must be judged by the laws of this State; but, since nothing has been shown to the contrary, we assume it would be equally void, as against public policy, in every other state of the Union, including Idaho. The case of Rumsey v. New York & Pennsylvania R. R. Co., 203 Pa. 579, 585, simply decides that "contracts valid by the law of the place and time where they are made and are to be performed, are valid everywhere"; that decision has no particular bearing

here. Finally we note that proof of the Idaho statutes was admissible properly to develop the facts involved in this case, and in order to show that the parties in interest were respectively applying for a grant in the nature of a public franchise.

We fail to see merit in the appellants' complaint concerning the trial judge's failure to answer their requests for findings of fact; as recently stated in Com. v. School District of Altoona, 241 Pa. 224, 229, "There is no requirement in the Act of 1874 that the court shall specifically answer upon the record all the requests for findings of fact submitted by counsel (Com. v. Monongahela Bridge Co., 216 Pa. 108), but, of course, the court's findings must cover all facts stated in the requests which are material to a proper determination of the issues involved." When the well stated opinion filed by the court below is read as a whole, it is clear that the trial judge substantially complied with the requirements of the established practice under the act in question. Some of plaintiffs' requests were so drawn that they could not be answered by a simple affirmation or negation; many of them were negatively answered by an affirmative finding of converse propositions included in the series of facts specifically found by the trial judge; others, such as those dealing with the individual attitude of commissioners toward competition among rival applicants, and the actual practice before the land board relating to matters positively regulated by statutory enactments, were wholly immaterial, as we have hereinbefore indicated; moreover, during the course of this opinion, incidentally, we have endeavored to point out that, in several instances, facts which the appellants seemed to consider of prime importance were, under what we have decided to be the governing principles of law, of no real materiality.

After a careful study of the entire record, and the most excellent briefs of counsel, it seems clear to us that the privilege sought by the respective applicants

was a right in the nature of a public franchise, and
it is equally clear that the proposal, or application,
withdrawn by the plaintiffs, was in the nature of a pre-
liminary bid, or offer, for this franchise. In each in-
stance, the consideration, or amount of the bid, consisted
of the merits of the proposed plan of irrigation, as set
forth in the application, including, of course, the price
which the applicant suggested he was willing to accept
for water rights from future settlers upon the land.
The right to reclaim desert land, by an irrigation project
such as the parties had in mind, was one granted by the
national government to the state itself, with the privi-
lege in the latter of enfranchising others by contract to
perform the work and, incidentally, to reap a proper
recompense or profit therefrom; it could only be con-
ferred by the state through its board of land commis-
sioners, and these officers, acting in the administration
of a public trust, when disposing of the franchise, were
bound by every principle of law to obtain the best pos-
sible plan for the work to be done, the most competent
and responsible contractor to do it, and the most favora-
ble terms for the eventual settlers. In the present in-
stance, that there was competition between the respec-
tive applicants is clear, else why should one be willing
to pay the other $300,000 to step aside? In cases of this
kind, it is plain that a premium paid to prevent compe-
tition is, almost invariably, either directly or indirectly,
charged upon the public; for it is but reasonable to as-
sume that in the end the terms will be calculated to
cover all expenditures, and therefore, if the successful
contractor pays a given sum to induce a rival to stand
out of the way, he can, if not compelled to make such
payment, afford to perform the work in question for the
recompense he is to receive less the amount paid to avoid
competition. As we have already shown, the law repro-
bates transactions such as the one before us, owing to
their general tendency for evil, irrespective of the results
in any special case; but, aside from this aspect of the

matter, there is but little force in the appellants' contention that, in this case, the public officials of Idaho were anxious to avoid competition because of their fear that both applicants might relinquish the whole Bruneau Desert irrigation project, for a reading of the testimony shows that the real apprehension entertained by some of the land commissioners, who appear to have been equally divided as to the merits of the respective proposals, was not that the two applicants might abandon the particular project then before them, but that, if they were not both pleased, the state might, in the end, lose, as a general operator in the field of irrigation, the one who was not favored by their grant; or to express the situation in the words of one of the commissioners: "The board looked at it from this standpoint, they wanted to keep both interests operating in the state, they thought they were good people for the state." This attitude on the part of certain of the commissioners was altogether too fanciful to save the plaintiffs' case. Of course administrative officials ofttimes are placed in a position where they must decide between two interests, each of which they would like to please, both for personal and official reasons, and, in such instances, they have a natural desire to avoid the disagreeable duty of selecting one as against the other, but this attitude on their part, while readily understood, cannot be given material weight in deciding a case of the character of the one now before us. Hyer v. Richmond Traction Co., 80 Fed. 839, 844, and 168 U. S. 471, is cited by both sides; although the opinions there reported contain much interesting discussion on the general subject at present under consideration, nevertheless, the decision in that case is not at all a controlling authority here. It remains but to say that, while we do not deem it necessary to pass specifically upon each of the forty-two assignments, yet, we are not convinced of material error in any respect.

The judgment of the court below is affirmed.