## Lurie v. Lurie

*Jack A. Rounick*, for plaintiff.
*Jordon R. Pitock*, for defendant.

GATES, P. J., Fifty-second Judicial District, Specially Presiding, February 12, 1976—On June 2, 1975, Bertram S. Lurie and Barbara J. Lurie, his wife, entered into a property settlement agreement which is the subject of this litigation. At that time, the parties were living separate and apart. The agreement was entered into after a temporary order of support for the wife and children had been entered on April 7, 1975.

On July 1, 1975, the wife instituted a divorce proceeding and a final decree in divorce was granted on or about December 5, 1975.

The property settlement agreement provided that, in the event a decree in divorce a.v.m. was not entered

within four months from its date (June 2, 1975), the agreement was null and void and the parties remitted to the appropriate court for determination of status. Although the agreement did contain a term allowing for an extension of the agreement in writing, admittedly this was not done.

Thus, on November 17, 1975, the husband notified his wife that he would not comply with the property settlement agreement. On the next day, his wife filed a complaint in equity admitting that the divorce decree was not entered within four months, contending that the delay was de minimis and that defendant should be required to proceed and comply with the settlement agreement. The court then entered an order temporarily enjoining the escrow agent from returning any money, documents and any other items presently held in escrow in accordance with the property settlement until further order of the court. A hearing was held on November 24, 1975, and the injunction was continued.

The matter was listed before the undersigned on December 31, 1975. At that time, we initially, and sua sponte, inquired as to the validity of the property settlement agreement and we requested the parties to submit briefs on the issue of the agreement's validity and enforceability. We now have briefs.

At oral argument, plaintiff's counsel questioned the propriety of our raising the issues presented here, sua sponte, citing Weigand v. Weigand, 461 Pa. 482, 337 A.2d 256 (1975). However, Weigand in no way supports this position.

In Weigand the Superior Court had sua sponte decided that sections 11 and 46 of Pennsylvania Divorce Law of May 2, 1929, P. L. 1237, as amended, 23 PS §§11 and 46, were unconstitutional. The Supreme Court noted that the constitutionality of these provisions was never questioned by the parties

either in the trial or in their briefs to the Superior Court. The Supreme Court merely noted that the issue was not properly before that court. The court noted that by deciding the constitutional issue, the Superior Court unnecessarily disturbed the processes of orderly judicial decision making. The court noted at 337 A.2d 257:

". . . Sua sponte consideration of issues deprives counsel of the opportunity to brief and argue the issues and the court of the benefit of counsel's advocacy. In sua sponte disposition of attacks upon the constitutionality of statutes, the attorney general is denied the opportunity of appearing and responding to the constitutional challenge. See Pa.R.Civ.P. 235(a). Furthermore, sua sponte determinations raise many of the considerations that led this Court to require without exception that issues presented on appeal be properly preserved for appellate review by timely objection in the trial court. . . ."

The distinctions here are obvious. The issue was raised at the trial level, albeit by the court. But the court afforded the parties the opportunity to brief and argue the issues. But most importantly, the court's concern was not the constitutionality of any statute but the legality of an agreement between private parties. No citations of authority are required for the basic proposition that a court of equity will not lend its aid in the enforcement of illegal agreements. An agreement which is contrary to public policy is illegal and will not be enforced by equity courts. Thus, it would be an exercise in futility to proceed into a lengthy hearing on the merits if ultimately the very agreement on which the suit is based is determined to be an illegal one. Thus, we are of the opinion that the issue has been properly raised.

The controlling legal principles of law applicable to this proceeding are agreed upon. Simply put, an agree-

ment between spouses which is directly conducive to the procurement of a divorce or encourages its attainment is collusive and void because it is contrary to public policy: Miller v. Miller, 284 Pa. 414, 131 Atl. 236 (1925); Shannon's Estate, 289 Pa. 280, 137 Atl. 251 (1927); Commonwealth v. Glennon, 92 Pa. Superior Ct. 94 (1927). While an agreement may be valid as between the parties, it must, nonetheless, yield to considerations of public policy and it is our duty to prevent the consummation of a fraudulent and illegal purpose: Irvin v. Irvin, 169 Pa. 529, 32 Atl. 445 (1895). Furthermore, the consideration and the mutual promises are indivisible. If a part of the agreement is illegal, it falls as a whole: Shannon's Estate, supra; Kuhn v. Buhl, 251 Pa. 348, 96 Atl. 977 (1916).

It seems evident to us that the teaching of our cases, when properly applied to the agreement with which we are now concerned, compels the conclusion that the contract is against public policy and should not be enforced by this court or any other court of our Commonwealth. It appears to us that the contract is so obviously a collusive agreement and is so directly conducive to the procurement of a divorce that it is difficult to conceive of reasonable minds differing. However, the parties here apparently do. Thus, we must extend the opinion.

The agreement is comprehensively drawn. The scrivener recognized that he was walking close between earth and water and began the agreement in the very first paragraph by loudly protesting that ". . . AGREEMENT NOT PREDICATED ON DIVORCE . . ." It specifically provides as follows:

". . . It is specifically understood and agreed by and between the parties hereto and each of the said parties does hereby represent to the other, that the execution and delivery of this Agreement is not predicated upon nor made subject to any agreement for the institution,

prosecution, defense, or for the nonprosecution, or nondefense of any action for divorce; provided, however, that nothing contained in the Agreement shall prevent or preclude either of the parties hereto from commencing, instituting or prosecuting any action or actions for divorce, either absolute or otherwise, upon just, legal and proper grounds; nor prevent either party from defending any such action which may, has been or shall be instituted by the other party, or from making any just or proper defense thereto. The Agreement shall remain in full force and effect regardless of any change in the marital status of the parties, except as otherwise specifically set forth herein."

We suppose that, having made it so very plain that the agreement is not predicated upon obtaining a divorce, we should end our toil and rest on the parties' agreement. But our duties are not for the short-winded and we should not look upon an animal with a sign proclaiming it to be a cow when what we plainly see is a horse. That the agreement is plainly and directly conducive to a divorce and predicated upon it is first disclosed in paragraph 7 of the agreement:

"7. RELEASE OF PROPERTY RIGHTS BY WIFE. At the time of the signing of this Agreement, or within thirty (30) days of the date hereof, Husband shall deposit with Arthur Lefkoe, Esquire, as escrowee, the sum of Twenty-Three Thousand Dollars ($23,000.00) to be held by him in escrow conditioned upon the entry of a final decree in divorce severing and terminating the marriage relationship between the parties hereto. Upon the entry of such decree within four (4) months from the date of this Agreement, the escrowee shall pay and deliver the said sum of Twenty-three Thousand Dollars ($23,000.00) to Wife's counsel in full payment to Wife for the release by her of such property rights as she may have in jointly or separately owned property, as is more fully hereinafter set forth."

It seems to me that this gives the wife an obvious incentive to seek a divorce. Money has always been the motive for malice and is the incentive for many things. Paragraph 7, stripped of legal lingo, says to the wife, get a divorce in four months and you'll get $23,000. If you don't, you won't.

The very next paragraph makes compliance by the wife of the preceding paragraph rather enticing. It provides, in pertinent part, as follows:

"8. RELEASE OF ALIMONY, COUNSEL FEES AND EXPENSES. At the time of the signing of this Agreement, Husband shall further deposit with Arthur Lefkoe, Esquire, as escrowee, the sum of Seven Hundred Fifty Dollars ($750.00) to be held by him in escrow conditioned upon the entry of a final decree in divorce severing and terminating the marriage relationship between the parties hereto. Upon the entry of such final decree within four (4) months from the date of this Agreement, the escrowee shall pay and deliver said Seven Hundred Fifty Dollars ($750.00) to Wife's counsel in full payment of any and all obligations of Husband for Wife's counsel fees and expenses of said divorce proceeding and Wife shall be solely liable for any balance due for her counsel fees over and above said amount.

Translating this paragraph from legal language into English, it seems to us to say to the wife, if you get a divorce in four months we'll not only pay you $23,000 but we'll pay your attorney's fees for getting it.

The agreement continues enticingly in paragraph 9 by the husband agreeing to give his wife all of the ". . . furniture, furnishings, rugs, household equipment, appliances, pictures, books, dishes, utensils, silverware and any other household goods or miscellaneous personalty of whatsoever nature, without limitation by specification, which are presently located or situate in or on the premises 1131 Dixon Lane,

Abington Township, Montgomery County, Pennsylvania. . . ." In subparagraph (b) of paragraph 9 of the agreement, he transfers title to the 1972 Ford Torino automobile. To top it off, in paragraph 10 the husband transfers title to the real estate jointly owned by the parties free and clear of any of the husband's liens. However, the agreement is contingent and the contingency for the furniture, automobile and the house is as follows:

". . . Upon and in the event of the entry or issuance of a final decree in divorce, divorcing the parties hereto within four (4) months of the date hereof the said escrowee shall forthwith deliver such deed, insurance policies and portion of sewer assessment to Wife or her counsel."

As we say in Pennsylvania Dutchland, it wonders me how two minds could differ about the proposition. If these promised performances are not an incentive for a wife to get a divorce, we don't know what else would do the job.

Now a wife might well be discouraged in pursuing a divorce, for it is the law in Pennsylvania that a husband's duty to support his wife terminates upon the granting of a divorce a.v.m. But this agreement allays such fears and, in so doing, obliquely encourages his wife to seek a divorce. In paragraph 11, it is provided that:

"(a) Until the entry of a final decree in divorce between the parties hereto, Husband agrees to continue to pay and Wife agrees to continue to accept as support for herself and children such payments as have been fixed under the temporary order of support entered on April 7, 1975, in proceedings in the Criminal Division of the Court of Common Pleas of Montgomery County, Pennsylvania as of No. 703 January Term, 1975.

"(b) Upon entry of a final decree in divorce between the parties hereto, Husband agrees to pay and Wife agrees to accept the monthly sum of Two Thousand Seven Hundred Fifty Dollars ($2,750.00) as alimony, in full support for herself and children, which sum shall continue to be payable until such time as Susan, the youngest child of the parties, graduates from high school and either enters college or becomes emancipated.

"(c) At such time as Susan graduates from high school and either enters college or becomes emancipated the monthly alimony payable by Husband to Wife shall be reduced to Seven Hundred Dollars ($700.00), and said sum shall continue to be payable by Husband to Wife until such time as Wife either remarries, otherwise regularly and continuously cohabits with a male for a period of six (6) months, or dies."

Again, we view these provisions for support and maintenance as a direct incentive to a wife to seek the contemplated divorce. Any other construction would be strained. There is a natural reluctance on the part of a wife to divorce her husband, for in so doing she forfeits her rights to support. That barrier is effectively removed by the terms of this agreement.

The incentive features of this agreement are further sweetened in paragraph 12 where the husband agrees to pay for the children's medical, dental and drug bills; maintain Blue Cross, Blue Shield and Major Medical Insurance coverage. The husband agrees to pay all expenses for his children while they are enrolled in college or other schools of higher learning. He also agrees to pay attendance expenses at a private school for Jeffrey, one of the children of the parties. He also agrees to pay all fees and necessary expenses for Susan's summer camp. He agrees further to maintain

substantial life insurance on the children; and he generously agrees to do other things. But his generosity in no way changes the character of this agreement. It is simply and plainly, in our judgment, an agreement conducive to the obtaining of a divorce decree and, therefore, illegal and violative of the public policy of the Commonwealth.

We have examined the authorities submitted to us by counsel for plaintiff. In all of them, we find substantial factual differences between the agreements construed by those cases and the agreement before us. The agreements under consideration by the courts in those authorities were construed by those courts as bona fide agreements relating to alimony or the adjustment of property rights between the spouses. They found that even though the agreements were made in contemplation of divorce, they were upheld because they were found not to be directly conducive to the procurement of a divorce. As we have pointed out here before, it is our considered judgment that the agreement under scrutiny is directly conducive to the procurement and is, consequently, illegal and one which will not be aided by a court of equity.

Counsel for plaintiff calls our attention to the present trend in divorce law toward "no-fault" divorce. They tell us in their briefs that our General Assembly is seriously considering such a proposal at this time. They suggest that this is indicative of changing public policy towards agreements to procure a divorce.

This argument echoes an historic legal occasion here in Lebanon County. One Illio Obric was convicted of murder in the first degree for killing his paramour. This unpleasant event occurred on October 15, 1916. The late President Judge Charles Vincent Henry of our court pronounced the death sentence on December 3, 1917. On February 27, 1918, Illio Obric's lawyers petitioned Judge Henry to stay the execution because there

was then legislation pending in the General Assembly to abolish capital punishment. Rather wisely, Judge Henry refused the petition. Nearly 60 years later, the General Assembly has not voiced a public policy in opposition to capital punishment. Will it ever so far as the family unit is concerned?

It is now clear that the American family, which has been on a downhill slide for 30 years has just hit the steep part of the slope. One prominent sociologist has predicted that if present rates continue to accelerate, there will be no families left by 1985. He notes that the marriage rate has hovered around ten per thousand Americans per year for 20 years. But he also notes that during that time the divorce rate has more than doubled until there is now nearly one divorce for every two marriages. We have read more divorce records in the past 15 years than we care to recall. The one thing that is evident from reading them is that marriage and the traditional family, if not on the skids, certainly are no longer the only game in town. If public policy is not in favor of preserving and protecting the family unit, it certainly should be. If the General Assembly enters the field of family law at this time in our history, it should do so with the view of strengthening family ties and encouraging people to stay married. We don't need a "no-fault" divorce law. We already have one. Perhaps this case is an example.

We have given consideration to the briefs submitted to us by counsel. Upon reflection, we are convinced that a court of equity should not exercise its awesome power in aid of enforcing a patently illegal agreement. Consequently, we shall enter the following

## ORDER

And now, February 12, 1976 upon consideration of the complaint in equity and after argument, the same is hereby dismissed.