THE A. P. SMITH MANUFACTURING COMPANY, PLAIN-
TIFF-RESPONDENT, v. RUTH F. BARLOW, WILLIAM
B. CAMPBELL, WILLIAM M. BRENN, EUGENE M.
SMITH AND JOSEPH P. HALPIN, INDIVIDUALLY AND
AS REPRESENTATIVES OF THE HOLDERS OF THE
PREFERRED AND COMMON SHARES OF THE A. P.
SMITH MANUFACTURING COMPANY, DEFENDANTS-
APPELLANTS, AND THEODORE D. PARSONS, ATTOR-
NEY-GENERAL OF NEW JERSEY, DEFENDANT-RE-
SPONDENT.

Argued June 9, 1953—Decided June 25, 1953.

*Mr. Josiah Stryker* argued the cause for defendants-appellants (*Messrs. Stryker, Tams & Horner*, attorneys).

*Mr. Waldron M. Ward* argued the cause for plaintiff-respondent (*Messrs. Pitney, Hardin & Ward*, attorneys; *Mr. Robert P. Weil* of the New York Bar, of counsel).

*Mr. Theodore D. Parsons*, Attorney-General, argued the cause for the State of New Jersey (*Mr. Thomas P. Cook*, Deputy Attorney-General, on the brief).

*Messrs. Jackson, Nash, Brophy, Barringer & Brooks* (*Mr. Williamson Pell, Jr.*, of counsel) of the New York Bar, attorneys for Princeton University, *amicus curiae*.

The opinion of the court was delivered by

JACOBS, J. The Chancery Division, in a well-reasoned opinion by Judge Stein, determined that a donation by the

plaintiff The A. P. Smith Manufacturing Company to Princeton University was *intra vires*. Because of the public importance of the issues presented, the appeal duly taken to the Appellate Division has been certified directly to this court under *Rule* 1:5–1(*a*).

The company was incorporated in 1896 and is engaged in the manufacture and sale of valves, fire hydrants and special equipment, mainly for water and gas industries. Its plant is located in East Orange and Bloomfield and it has approximately 300 employees. Over the years the company has contributed regularly to the local community chest and on occasions to Upsala College in East Orange and Newark University, now part of Rutgers, the State University. On July 24, 1951 the board of directors adopted a resolution which set forth that it was in the corporation's best interests to join with others in the 1951 Annual Giving to Princeton University, and appropriated the sum of $1,500 to be transferred by the corporation's treasurer to the university as a contribution towards its maintenance. When this action was questioned by stockholders the corporation instituted a declaratory judgment action in the Chancery Division and trial was had in due course.

Mr. Hubert F. O'Brien, the president of the company, testified that he considered the contribution to be a sound investment, that the public expects corporations to aid philanthropic and benevolent institutions, that they obtain good will in the community by so doing, and that their charitable donations create favorable environment for their business operations. In addition, he expressed the thought that in contributing to liberal arts institutions, corporations were furthering their self-interest in assuring the free flow of properly trained personnel for administrative and other corporate employment. Mr. Frank W. Abrams, chairman of the board of the Standard Oil Company of New Jersey, testified that corporations are expected to acknowledge their public responsibilities in support of the essential elements of our free enterprise system. He indicated that it was not "good business" to disappoint "this reasonable and justified

public expectation," nor was it good business for corporations "to take substantial benefits from their membership in the economic community while avoiding the normally accepted obligations of citizenship in the social community." Mr. Irving S. Olds, former chairman of the board of the United States Steel Corporation, pointed out that corporations have a self-interest in the maintenance of liberal education as the bulwark of good government. He stated that "Capitalism and free enterprise owe their survival in no small degree to the existence of our private, independent universities" and that if American business does not aid in their maintenance it is not "properly protecting the long-range interest of its stockholders, its employees and its customers." Similarly, Dr. Harold W. Dodds, President of Princeton University, suggested that if private institutions of higher learning were replaced by governmental institutions our society would be vastly different and private enterprise in other fields would fade out rather promptly. Further on he stated that "democratic society will not long endure if it does not nourish within itself strong centers of non-governmental fountains of knowledge, opinions of all sorts not governmentally or politically originated. If the time comes when all these centers are absorbed into government, then freedom as we know it, I submit, is at an end."

The objecting stockholders have not disputed any of the foregoing testimony nor the showing of great need by Princeton and other private institutions of higher learning and the important public service being rendered by them for democratic government and industry alike. Similarly, they have acknowledged that for over two decades there has been state legislation on our books which expresses a strong public policy in favor of corporate contributions such as that being questioned by them. Nevertheless, they have taken the position that (1) the plaintiff's certificate of incorporation does not expressly authorize the contribution and under common-law principles the company does not possess any implied or incidental power to make it, and (2) the New Jersey statutes which expressly authorize the contribution

may not constitutionally be applied to the plaintiff, a corporation created long before their enactment. See *R. S.* 14:3–13; *R. S.* 14:3–13.1 *et seq.*

In his discussion of the early history of business corporations Professor Williston refers to a 1702 publication where the author stated flatly that "The general intent and end of all civil incorporations is for better government." And he points out that the early corporate charters, particularly their recitals, furnish additional support for the notion that the corporate object was the public one of managing and ordering the trade as well as the private one of profit for the members. See 3 *Select Essays on Anglo-American Legal History* 201 (1909); 1 *Fletcher, Corporations* (rev. ed. 1931), 6. See also *Currie's Administrators v. The Mutual Assurance Society,* 4 *Hen. & M.* 315, 347 (*Va. Sup. Ct. App.* 1809), where Judge Roane referred to the English corporate charters and expressed the view that acts of incorporation ought never to be passed "but in consideration of services to be rendered to the public." However, with later economic and social developments and the free availability of the corporate device for all trades, the end of private profit became generally accepted as the controlling one in all businesses other than those classed broadly as public utilities. *Cf. Dodd, For Whom Are Corporate Managers Trustees?,* 45 *Harv. L. Rev.* 1145, 1148 (1932). As a concomitant the common-law rule developed that those who managed the corporation could not disburse any corporate funds for philanthropic or other worthy public cause unless the expenditure would benefit the corporation. *Hutton v. West Cork Railway Company,* 23 *Ch. D.* 654 (1883); *Dodge v. Ford Motor Co.,* 204 *Mich.* 459, 170 *N. W.* 668, 3 *A. L. R.* 413 (*Sup. Ct.* 1919). *Ballantine, Corporations* (rev. ed. 1946), 228; 6A *Fletcher, supra,* 667. During the 19th Century when corporations were relatively few and small and did not dominate the country's wealth, the common-law rule did not significantly interfere with the public interest. But the 20th Century has presented a different climate. *Berle and Means, The Modern Corporation and Private*

*Property* (1948). Control of economic wealth has passed largely from individual entrepreneurs to dominating corporations, and calls upon the corporations for reasonable philanthropic donations have come to be made with increased public support. In many instances such contributions have been sustained by the courts within the common-law doctrine upon liberal findings that the donations tended reasonably to promote the corporate objectives. See *Cousens, How Far Corporations May Contribute to Charity,* 35 *Va. L. Rev.* 401 (1949).

Thus, in the leading case of *Evans v. Brunner, Mond & Company, Ltd.* [1921] 1 *Ch.* 359, the court held that it was within the incidental power of a chemical company to grant £100,000 to universities or other scientific institutions selected by the directors "for the furtherance of scientific education and research." The testimony indicated that the company desired to encourage and assist men who would devote their time and abilities to scientific study and research generally, a class of men for whom the company was constantly on the lookout. This benefit was not considered by the court to be so remote as to bring it outside the common-law rule. Similarly, in *Armstrong Cork Co. v. H. A. Meldrum Co.,* 285 *F.* 58 (*D. C. W. D. N. Y.* 1922), the court sustained contributions made by the corporation to the University of Buffalo and Canisius College. In the course of its opinion the court quoted the familiar comment from *Steinway v. Steinway & Sons,* 17 *Misc.* 43, 40 *N. Y. S.* 718 (*Sup. Ct.* 1896), to the effect that as industrial conditions change business methods must change with them and acts become permissible which theretofore were considered beyond the corporate powers; and on the issue as to whether the corporation had received any corporate benefit it said:

"It was also considered, in making the subscriptions or donations, that the company would receive advertisement of substantial value, including the good will of many influential citizens and of its patrons, who were interested in the success of the development of these branches of education, and, on the other hand, suffer a loss of prestige if the contributions were not made, in view of the fact that business competitors had donated and shown a commendable public

spirit in that relation. In the circumstances the rule of law that may fairly be applied is that the action of the officers of the company was not *ultra vires*, but was in fact within their corporate powers, since it tended to promote the welfare of the business in which the corporation was engaged."

In *American Rolling Mill Co. v. Commissioner of Internal Revenue*, 41 *F. 2d* 314 (*C. C. A.* 6 1930), the corporation had joined with other local industries in the creation of a civic improvement fund to be distributed amongst community enterprises including the Boy Scouts and Girl Scouts, the Y. M. C. A., the Hospital, etc. The court readily sustained the contribution as an ordinary and necessary expense of the business within the Revenue Act. And in *Greene County Nat. Farm Loan Ass'n v. Federal Land Bank of Louisville*, 57 *F. Supp.* 783, 789 (*D. C. W. D. Ky.* 1944), affirmed 152 *F. 2d* 215 (*6th Cir.* 1945), *cert.* denied 328 *U. S.* 834, 66 *S. Ct.* 978, 90 *L. Ed.* 1610 (1946), the court in dealing with a comparable problem said:

"But it is equally well established that corporations are permitted to make substantial contributions which have the outward form of gifts where the activity being promoted by the so-called gift tends reasonably to promote the goodwill of the business of the contributing corporation. Courts recognize in such cases that although there is no dollar and cent supporting consideration, yet there is often substantial indirect benefit accruing to the corporation which supports such action. So-called contributions by corporations to churches, schools, hospitals, and civic improvement funds, and the establishment of bonus and pension plans with the payment of large sums flowing therefrom have been upheld many times as reasonable business expenditures rather than being classified as charitable gifts. *American Rolling Mill Co. v. Commissioner of Internal Revenue*, 6 *Cir.*, 41 *F. 2d* 314; *Heinz v. National Bank of Commerce*, 8 *Cir.*, 237 *F.* 942; *Corning Glass Works v. Lucas*, 59 *App. D. C.* 168, 37 *F. 2d* 798, 68 *A. L. R.* 736; *Forbes Lithograph Mfg. Co. v. White*, *D. C. Mass.*, 42 *F. 2d* 287; *American National Assurance Co. v. Ricketts*, 230 *Ky.* 398, 19 *S. W. 2d* 1071."

The foregoing authorities illustrate how courts, while adhering to the terms of the common-law rule, have applied it very broadly to enable worthy corporate donations with indirect benefits to the corporations. In *State ex rel. Sorensen v. Chicago B. & Q. R. Co.*, 112 *Neb.* 248, 199 *N. W.* 534,

537 (1924), the Supreme Court of Nebraska, through Justice
Letton, went even further and without referring to any
limitation based on economic benefits to the corporation said
that it saw "no reason why if a railroad company desires to
foster, encourage and contribute to a charitable enterprise,
or to one designed for the public weal and welfare, it may
not do so"; later in its opinion it repeated this view with
the expression that it saw "no reason why a railroad corpora-
tion may not, to a reasonable extent, donate funds or services
to aid in good works." Similarly, the court in *Carey v.
Corporation Commission of Oklahoma*, 168 *Okla.* 487, 33
*P. 2d* 788, 794 (*Sup. Ct.* 1934), while holding that a public
service company was not entitled to an increase in its rates
because of its reasonable charitable donations, broadly recog-
nized that corporations, like individuals, have power to make
them. *Cf. New Jersey Bell Telephone Company v. Depart-
ment of Public Utilities*, 12 *N. J.* 568 (1953). In the
course of his opinion for the court in the *Carey* case Justice
Bayless said:

"Next is the question of dues, donations, and philanthropies of the
Company. It is a matter for the discretion of corporate manage-
ment in making donations and paying dues. In that respect a
corporation does not occupy a status far different from an individual.
An individual determines the propriety of joining organizations, and
contributing to their support by paying dues, and all contribution to
public charities, etc., according to his means. He does not make
such contributions above his means with the hope that his employer
will increase his compensation accordingly. A corporation likewise
should not do so. Its ultimate purpose, from its own standpoint, is
to earn and pay dividends. If, as a matter of judgment, it desires
to take part of its earnings, just as would an individual, and con-
tribute them to a worthy public cause, it may do so; but we do not
feel that it should be allowed to increase its earnings to take care
thereof."

Over 20 years ago Professor Dodd, *supra*, 45 *Harv. L. Rev.*,
at 1159, 1160, cited the views of Justice Letton in *State ex
rel. Sorensen v. Chicago B. & Q. R. Co.*, *supra*, with seeming
approval and suggested the doctrine that corporations may
properly support charities which are important to the welfare

of the communities where they do business as soundly representative of the public attitude and actual corporate practice. Developments since he wrote leave no doubts on this score.

When the wealth of the nation was primarily in the hands of individuals they discharged their responsibilities as citizens by donating freely for charitable purposes. With the transfer of most of the wealth to corporate hands and the imposition of heavy burdens of individual taxation, they have been unable to keep pace with increased philanthropic needs. They have therefore, with justification, turned to corporations to assume the modern obligations of good citizenship in the same manner as humans do. Congress and state legislatures have enacted laws which encourage corporate contributions, and much has recently been written to indicate the crying need and adequate legal basis therefor. See *Ruml, The Manual of Corporate Giving*, 3, 35 (1952); *Garrett, Corporate Donations to Charity*, 4 *The Business Lawyer* 28 (1948); 8 *The Business Lawyer* 22 (1953); *Bell, Corporate Support of Education*, 38 *A. B. A. J.* 119 (1952); *de Capriles and Garrett, Legality of Corporate Support to Education*, 38 *A. B. A. J.* 209 (1952); *Bleicken, Corporate Contributions to Charity*, 38 *A. B. A. J.* 999 (1952); *Andrews, Corporation Giving*, 15, 158, 201 (1952). *Cf. Navarro, Corporate Authority to Contribute to Charity*, 26 *Phil. L. J.* 187 (1951); *Stevens, Corporations (2d ed.* 1949), 252. In actual practice corporate giving has correspondingly increased. Thus, it is estimated that annual corporate contributions throughout the nation aggregate over 300 million dollars with over 60 million dollars thereof going to universities and other educational institutions. Similarly. it is estimated that local community chests receive well over 40% of their contributions from corporations; these contributions and those made by corporations to the American Red Cross, to Boy Scouts and Girl Scouts, to 4-H Clubs and similar organizations have almost invariably been unquestioned.

During the first world war corporations loaned their personnel and contributed substantial corporate funds in order to insure survival; during the depression of the '30s

they made contributions to alleviate the desperate hardships of the millions of unemployed; and during the second world war they again contributed to insure survival. They now recognize that we are faced with other, though nonetheless vicious, threats from abroad which must be withstood without impairing the vigor of our democratic institutions at home and that otherwise victory will be pyrrhic indeed. More and more they have come to recognize that their salvation rests upon sound economic and social environment which in turn rests in no insignificant part upon free and vigorous nongovernmental institutions of learning. It seems to us that just as the conditions prevailing when corporations were originally created required that they serve public as well as private interests, modern conditions require that corporations acknowledge and discharge social as well as private responsibilities as members of the communities within which they operate. Within this broad concept there is no difficulty in sustaining, as incidental to their proper objects and in aid of the public welfare, the power of corporations to contribute corporate funds within reasonable limits in support of academic institutions. But even if we confine ourselves to the terms of the common-law rule in its application to current conditions, such expenditures may likewise readily be justified as being for the benefit of the corporation; indeed, if need be the matter may be viewed strictly in terms of actual survival of the corporation in a free enterprise system. The genius of our common law has been its capacity for growth and its adaptability to the needs of the times. Generally courts have accomplished the desired result indirectly through the molding of old forms. Occasionally they have done it directly through frank rejection of the old and recognition of the new. But whichever path the common law has taken it has not been found wanting as the proper tool for the advancement of the general good. *Cf. Holmes, The Common Law*, 1, 5 (1951); *Cardoza, Paradoxes of Legal Science, Hall, Selected Writings*, 253 (1947).

In 1930 a statute was enacted in our State which expressly provided that any corporation could cooperate with other

corporations and natural persons in the creation and maintenance of community funds and charitable, philanthropic or benevolent instrumentalities conducive to public welfare, and could for such purposes expend such corporate sums as the directors "deem expedient and as in their judgment, will contribute to the protection of the corporate interests." *L.* 1930, *c.* 105; *L.* 1931, *c.* 290; *R. S.* 14:3–13. See 53 *N. J. L. J.* 335 (1930). Under the terms of the statute donations in excess of 1% of the capital stock required 10 days' notice to stockholders and approval at a stockholders' meeting if written objections were made by the holders of more than 25% of the stock; in 1949 the statute was amended to increase the limitation to 1% of capital and surplus. See *L.* 1949, *c.* 171. In 1950 a more comprehensive statute was enacted. *L.* 1950, *c.* 220; *N. J. S. A.* 14:3–13.1 *et seq.* In this enactment the Legislature declared that it shall be the public policy of our State and in furtherance of the public interest and welfare that encouragement be given to the creation and maintenance of institutions engaged in community fund, hospital, charitable, philanthropic, educational, scientific or benevolent activities or patriotic or civic activities conducive to the betterment of social and economic conditions; and it expressly empowered corporations acting singly or with others to contribute reasonable sums to such institutions, provided, however, that the contribution shall not be permissible if the donee institution owns more than 10% of the voting stock of the donor and provided, further, that the contribution shall not exceed 1% of capital and surplus unless the excess is authorized by the stockholders at a regular or special meeting. To insure that the grant of express power in the 1950 statute would not displace pre-existing power at common law or otherwise, the Legislature provided that the "act shall not be construed as directly or indirectly minimizing or interpreting the rights and powers of corporations, as heretofore existing, with reference to appropriations, expenditures or contributions of the nature above specified." *N. J. S. A.* 14:3–13.3. It may be noted that statutes relating to charitable contributions by corpora-

tions have now been passed in 29 states. See *Andrews, supra,* 235.

The appellants contend that the foregoing New Jersey statutes may not be applied to corporations created before their passage. Fifty years before the incorporation of The A. P. Smith Manufacturing Company our Legislature provided that every corporate charter thereafter granted "shall be subject to alteration, suspension and repeal, in the discretion of the legislature." *L.* 1846, *p.* 16; *R. S.* 14:2–9. A similar reserved power was placed into our State Constitution in 1875 (*Art. IV, Sec. VII, par.* 11), and is found in our present Constitution. *Art. IV, Sec. VII, par.* 9. In the early case of *Zabriskie v. Hackensack and New York Railroad Company,* 18 *N. J. Eq.* 178 (*Ch.* 1867), the court was called upon to determine whether a railroad could extend its line, above objection by a stockholder, under a legislative enactment passed under the reserve power after the incorporation of the railroad. Notwithstanding the breadth of the statutory language and persuasive authority elsewhere (*Durfee v. Old Colony & Fall River Railroad Company,* 87 *Mass.* 230 (*Sup. Jud. Ct.* 1862)), it was held that the proposed extension of the company's line constituted a vital change of its corporate object which could not be accomplished without unanimous consent. See *Latlin, A Primer on Fundamental Corporate Changes,* 1 *West. Res. L. Rev.* 3, 7 (1949). The court announced the now familiar New Jersey doctrine that although the reserved power permits alterations in the public interest of the contract between the state and the corporation, it has no effect on the contractual rights between the corporation and its stockholders and between stockholders *inter se.* Unfortunately, the court did not consider whether it was not contrary to the public interest to permit the single minority stockholder before it to restrain the railroad's normal corporate growth and development as authorized by the Legislature and approved, reasonably and in good faith, by the corporation's managing directors and majority stockholders. Although the later cases in New Jersey have not disavowed the doctrine of the *Zabriskie* case, it is noteworthy

that they have repeatedly recognized that where justified by the advancement of the public interest the reserved power may be invoked to sustain later charter alterations even though they affect contractual rights between the corporation and its stockholders and between stockholders *inter se.* See *Berger v. United States Steel Corporation,* 63 *N. J. Eq.* 809, 824 (*E. & A.* 1902); *Murray v. Beattie Manufacturing Co.,* 79 *N. J. Eq.* 604, 609 (*E. & A.* 1912); *Grausman v. Porto Rican-American Tobacco Co.,* 95 *N. J. Eq.* 155 (*Ch.* 1923), affirmed on other ground 95 *N. J. Eq.* 223 (*E. & A.* 1923); *Bingham v. Savings Investment & Trust Co.,* 101 *N. J. Eq.* 413, 415 (*Ch.* 1927), affirmed 102 *N. J. Eq.* 302 (*E. & A.* 1928); *In re Collins-Doan Co.,* 3 *N. J.* 382, 391 (1949). *Cf. Stale v. Miller,* 30 *N. J. L.* 368, 373 (*Sup. Ct.* 1863), affirmed 31 *N. J. L.* 521 (*E. & A.* 1864); *Montclair v. New York & Greenwood Lake Railway Co.,* 45 *N. J. Eq.* 436, 444 (*Ch.* 1889), reversed on other grounds 47 *N. J. Eq.* 591 (*E. & A.* 1890); *Moore v. Conover,* 123 *N. J. Eq.* 61, 74 (*Ch.* 1937).

Thus, in the *Berger* case the Court of Errors and Appeals sustained the applicability under the reserved power of provisions relating to corporate borrowing and the purchase of corporate stock, and in considering the doctrine of the *Zabriskie* case noted that the rights of the stockholders *inter se* may not be impaired "except in so far as impairment may result from an alteration required by the public interest." And later in its opinion the court, referring to the provision in the Corporation Act of 1896 that the act and all amendments shall be a part of the charter of every corporation formed theretofore or thereafter, said: "It is difficult to perceive how any substantial force can be accorded to it, unless some amendment may be made which may affect the rights of stockholders *inter sese* to some extent." In the *Murray* case the court sustained a statute substituting a discretionary power to pay dividends for a pre-existing duty; in the course of his opinion Justice Swayze indicated that even apart from stockholders' consent the statutory alteration could be sustained since it was "a matter of state concern

that a corporation should be permitted to accumulate a sufficient fund to secure its credit and make permanent its successful operation." And in the *Bingham* case the court sustained a bank merger under the authority of legislation enacted after the incorporation of the bank, with Vice-Chancellor Backes pointing out that the office of the reserve power in our organic and statutory law "is to safeguard the public interests in corporate grants."

This court had recent occasion to deal with the problem in *In re Collins-Doan Co., supra.* There it appeared that the board of directors was hopelessly deadlocked and application was duly made under *L.* 1938, *c.* 303 (*N. J. S. A.* 14:13–15) by the plaintiffs, representing half the directors and stockholders, for dissolution of the corporation. The defendants representing the other half resisted the application, contending that since the corporation was formed in 1916 it could not be dissolved except with the consent of two-thirds of the stockholders. This court, while recognizing that the later enactment did affect the rights between the corporation and its stockholders and between the stockholders *inter se,* nevertheless held that it was applicable to the pre-existing corporation as a proper exercise of the reserved power. In the course of his opinion for the court Justice Heher pointed out that "the contractual rights of the stockholders *inter se* are not proof against 'alteration required by the public interest.'" It may be noted that the later enactment not only affected the relations between the corporation and stockholders and the stockholders *inter se,* but also enabled complete termination of the original corporate objectives; yet this court found little difficulty in subordinating these considerations to the paramount public interest in avoiding the indefinite continuance of a corporation which could not function with propriety because of the "stalemate in corporate management." See *In re Evening Journal Association,* 1 *N. J.* 437, 444 (1948). The legislative function recognized here may be considered somewhat akin to that under the police power generally where private interests frequently are called upon to give way to the

paramount public interest. See *Reingold v. Harper*, 6 *N. J.* 182, 193 (1951); *McSweeney v. Equitable Trust Co.*, 16 *N. J. Misc.* 193, 197 (*Sup. Ct.* 1938), affirmed 127 *N. J. L.* 299 (*E. & A.* 1941), app. dism. 315 *U. S.* 785, 62 *S. Ct.* 805, 86 *L. Ed.* 1191 (1942); *Union Dry Goods Company v. Georgia Public Service Corporation*, 248 *U. S.* 372, 39 *S. Ct.* 117, 63 *L. Ed.* 309 (1919). See also *Lakewood Express Service, Inc. v. Board of Public Utility Commissioners*, 1 *N. J.* 45, 50 (1948), where Justice Oliphant, in discussing the police power, said:

"This power extends to all great public needs and the constitutional interdictions as to due process and the protection of property rights does not prevent a state from exercising such powers as are vested in it for the promotion of the common weal or are necessary for the general good of the public even though property or contract rights are affected. *Manigualt v. Springs*, 199 *U. S.* 473, 26 *S. Ct.* 127, 50 *L. Ed.* 274; *Home Building & Loan Ass'n v. Blaisdell*, 290 *U. S.* 398, 54 *S. Ct.* 231, 78 *L. Ed.* 413, 88 *A. L. R.* 1481; *Veix v. Sixth Ward B. & L. Ass'n of Newark, N. J.*, 310 *U. S.* 32, 60 *S. Ct.* 792, 84 *L. Ed.* 1061; *Bucsi v. Longworth B. & L. Ass'n, Err. & App.* 1937, 119 *N. J. L.* 120, 123."

[3] State legislation adopted in the public interest and applied to pre-existing corporations under the reserved power has repeatedly been sustained by the United States Supreme Court above the contention that it impairs the rights of stockholders and violates constitutional guarantees under the Federal Constitution. Thus, in *Looker v. Maynard*, 179 *U. S.* 46, 21 *S. Ct.* 21, 45 *L. Ed.* 79 (1900), the court sustained the application to pre-existing corporations of later legislation designed to secure minority representation on boards of directors by permitting cumulative voting by stockholders; in *Polk v. Mutual Reserve Fund Life Association of New York*, 207 *U. S.* 310, 28 *S. Ct.* 65, 52 *L. Ed.* 222 (1907), the court sustained state legislation which permitted reorganizations of existing corporations involving changes in their corporate purposes; in *Veix v. Sixth Ward Bldg. & Loan Association of Newark*, 310 *U. S.* 32, 60 *S. Ct.* 792, 84 *L. Ed.* 1061 (1940), a New Jersey statute which altered the withdrawal rights of building and loan shareholders was

upheld; and in *Sutton v. New Jersey,* 244 *U. S.* 258, 37 *S. Ct.* 508, 61 *L. Ed.* 1117 (1917), a New Jersey statute which required pre-existing street railway corporations to carry police officers without charge was upheld as a proper exercise of the reserve power. Many other instances which sustain legislative enactments adopted in the public interest but affecting the relations between the corporation and its stockholders and between stockholders *inter se,* as well as the contract between the State and the corporation, may be found cited in the opinion below and in *Ballantine, supra, p.* 648; 7 *Fletcher, supra, p.* 815; 54 *Harv. L. Rev.* 1368 (1941); 13 *Am. Jur.* 233 (1938); 16 *C. J. S., Constitutional Law,* § 320, *p.* 759 (1939). We are entirely satisfied that within the orbit of above authorities the legislative enactments found in *R. S.* 14:3–13 and *N. J. S. A.* 14:3–13.1 *et seq.* and applied to pre-existing corporations do not violate any constitutional guarantees afforded to their stockholders.

It seems clear to us that the public policy supporting the statutory enactments under consideration is far greater and the alteration of pre-existing rights of stockholders much lesser than in the cited cases sustaining various exercises of the reserve power. In encouraging and expressly authorizing reasonable charitable contributions by corporations, our State has not only joined with other states in advancing the national interest but has also specially furthered the interests of its own people who must bear the burdens of taxation resulting from increased state and federal aid upon default in voluntary giving. It is significant that in its enactments the State had not in anywise sought to impose any compulsory obligations or alter the corporate objectives. And since in our view the corporate power to make reasonable charitable contributions exists under modern conditions, even apart from express statutory provision, its enactments simply constitute helpful and confirmatory declarations of such power, accompanied by limiting safeguards.

In the light of all of the foregoing we have no hesitancy in sustaining the validity of the donation by the

plaintiff. There is no suggestion that it was made indiscriminately or to a pet charity of the corporate directors in furtherance of personal rather than corporate ends. On the contrary, it was made to a preeminent institution of higher learning, was modest in amount and well within the limitations imposed by the statutory enactments, and was voluntarily made in the reasonable belief that it would aid the public welfare and advance the interests of the plaintiff as a private corporation and as part of the community in which it operates. We find that it was a lawful exercise of the corporation's implied and incidental powers under common-law principles and that it came within the express authority of the pertinent state legislation. As has been indicated, there is now widespread belief throughout the nation that free and vigorous non-governmental institutions of learning are vital to our democracy and the system of free enterprise and that withdrawal of corporate authority to make such contributions within reasonable limits would seriously threaten their continuance. Corporations have come to recognize this and with their enlightenment have sought in varying measures, as has the plaintiff by its contribution, to insure and strengthen the society which gives them existence and the means of aiding themselves and their fellow citizens. Clearly then, the appellants, as individual stockholders whose private interests rest entirely upon the well-being of the plaintiff corporation, ought not be permitted to close their eyes to present-day realities and thwart the long-visioned corporate action in recognizing and voluntarily discharging its high obligations as a constituent of our modern social structure.

The judgment entered in the Chancery Division is in all respects

Affirmed.

*For affirmance*—Chief Justice VANDERBILT, and Justices HEHER, OLIPHANT, WACHENFELD, BURLING and JACOBS—6.

*For reversal*—None.