Ella M. **KELLY**, and Wyndham, Inc., a corporation of the State of Delaware, Plaintiffs,

v.

Charles H. **BELL** et al., Defendants.

Court of Chancery of Delaware.

New Castle.

May 15, 1969.

Vincent A. Theisen, Aubrey B. Lank and William H. Uffelman, Jr., of Theisen, Lank & Kelleher, Wilmington, for plaintiffs.

James M. Tunnell, Jr., Andrew B. Kirkpatrick, Jr., and Richard L. Sutton, of Morris, Nichols, Arsht & Tunnell, Wilmington, for defendant United States Steel Corp.

William S. Potter, Richard F. Corroon and Charles S. Crompton, Jr., of Potter, Anderson & Corroon, Wilmington, for individual defendants.

DUFFY, Chancellor:

Ella M. Kelly and Wyndham, Inc., a Delaware corporation (plaintiffs), are stockholders of United States Steel Corporation, a Delaware corporation (U. S. Steel). They sue derivatively all persons who are now directors of U. S. Steel and/or who were directors in 1957 (defendants). Plaintiffs seek a money judgment for Steel's benefit upon the proposition that certain "machinery tax payments" made by the Corporation after 1957 to County and other local taxing authorities in Allegheny County, Pennsylvania, constituted a waste of assets because they were not required or permitted by Pennsylvania law.

None of the individual defendants has any personal interest in, nor has any of them received, any personal benefit of any kind from the payments. Defendants deny that the payments were a waste of assets and argue to the contrary, saying that they were made in the Corporation's best interest.

This is the decision on defendants' motion for summary judgment and on plaintiffs' motion to strike affidavits.

I

The facts in the case are unique, at least in the Delaware experience. In Pennsylvania for many years prior to 1956 all machinery, tools, appliances and other equipment used in an industrial establishment, whether attached to realty or not, were assessable as part of the real property and thus subject to an *ad valorem* tax.[1] In 1956 legislation became effective which provided that such machinery and other items could no longer be assessed as real property for tax purposes, but Allegheny County and its political subdivisions were excluded from the change in tax base. That County was excepted because many of its communities were heavily dependent on "machinery assessments" for their essential revenues. In 1957, however, Allegheny County was a depressed economic area and the taxation of machinery and related equipment was commonly regarded as a major cause of that condition. The tax tended to dissuade new industries from locating in the County and it dampened expansion plans of those already there.

In March 1957 legislation was proposed in the Pennsylvania General Assembly to eliminate the power of Allegheny County and its political subdivisions to include the value of machinery in real property assessments. But the proposal provoked strong opposition from municipalities and school districts in the County which were concerned about the impact of any such change on their revenues. Efforts were made by the interested parties to reach an accommodation. And so the bill was amended to provide for the elimination of machinery assessments in twenty-percent steps over a five-year period and in that form the bill passed the House (H.B. 797). But substantial opposition remained, including that of the County Commissioners.

U. S. Steel was vitally interested in passage of the bill because of its heavy concentration of manufacturing facilities in Allegheny County. In 1957 assessment of the Corporation's machinery accounted for about 42% of all machinery assessments in the County, and Steel expected to make substantial expenditures for new machinery in the County. Steel was also interested in passage of the bill because it would at-

---

1. Apparently this developed in Pennsylvania more than a century ago and is known as the "Assembled Industrial Plant Doctrine."

tract new industries to the County and thus ease the tax burden. Other major manufacturers in the County supported the legislation; these included Allegheny Ludlum Steel Corporation, Blaw-Knox Company, Pittsburgh Plate Glass Company (now PPG Industries, Inc.), Westinghouse Air Brake Company and Westinghouse Electric Corporation. These so-called "Big Six" companies, including U. S. Steel, wanted the bill passed for essentially the same reasons: to eliminate taxes on machinery, particularly new machinery, and to attract new industry to the County. But opposition continued. Louis M. Sloan, who was Director of Steel's Tax Division, states:

"The communities which would be most affected by the machinery elimination were still not satisfied with HB 797 as amended. The communities were opposed to the substitute means of making up the loss of tax revenue which had been suggested by the Economy League and resistance to the enactment of HB 797 continued unabated. Further meetings and discussions among the major taxpayers and representatives of the affected communities and county officials· and others were held. On May 16 after meeting the previous day with the communities most affected, the Allegheny County Commissioners withdrew their support of HB 797 * * *. The support of the County Commissioners was vital if the legislation were to pass. Without it the bill could not get through the Pennsylvania Senate, bearing in mind the vehement opposition of the communities. Even though the Republicans were in the majority in both houses of the legislature (145–83 in the House and 27–23 in the Senate), the majority in the Senate was slim and Governor George M. Leader was a Democrat. The communities most affected were controlled by Democrats and two of the three County Commissioners were Democrats. Thus, there was little or no prospect that there would be any significant support for the bill from the Democrats and in view of this lack of support it would be difficult for the Democratic Governor to sign the bill into law should it be passed by the legislature. Recognizing the political realities of the situation, the six major industries in the county (Allegheny Ludlum, Blaw-Knox, Pittsburgh Plate Glass, United States Steel, Westinghouse Airbrake, and Westinghouse Electric) conferred and concurred that if this important and over-all desirable legislation were to be approved by the Senate and signed into law by the Governor, a concert of action by these companies by offering some concession to gain the support of the communities and County Commissioners would be absolutely necessary. Out of these discussions, there developed a plan of action, concurred in by all of the six companies, namely, that they would individually and severally commit themselves to continue to pay taxes on machinery on the tax rolls as of December 31, 1957, to the various municipalities, school districts, and county, but with the understanding that beginning with 1958 all additional acquisitions of machinery would be tax exempt."

Thus the "Big Six" concluded that the bill would not be passed and approved unless the companies agreed to take no action which would disturb the financial balance of the communities opposing the bill. Accordingly, each company made the commitment, identical in substance, to the various communities and other interested government officials. U. S. Steel's commitment was as follows:[2]

"United States Steel agrees if HB 797 is enacted into law:

1. Beginning with the year 1958 and all subsequent years to continue to

2. This statement was included in a letter dated July 3, 1957 from an Executive Vice-President of U. S. Steel to a member of the Allegheny County Board of Commissioners.

pay property taxes on machinery and equipment on the tax rolls as of December 31, 1957, on the basis of its then valuation. This tax would be in addition to the normal tax on real estate, that is, land and buildings.

2. Beginning with 1958, in the event machinery or equipment is retired from service and replaced with another unit performing the same function, there would be no reduction in the December 31, 1957, valuation of machinery and equipment, but correspondingly, there would be no increase in the assessment because of the new installations.

3. In the event a new building is erected, either as a new unit or as a replacement of a former building, which would normally result in an increased valuation of real estate, a reduction would be allowed in the December 31, 1957, valuation of machinery and equipment to offset the increased valuation arising out of the new building or a reappraisal of real estate. There would be no net increase in our total valuation until such time as all of the December 31, 1957, valuation of machinery and equipment had been eliminated.

4. Beginning with the year 1958, in the event machinery or equipment is retired from service without being replaced or if machinery or equipment is removed from the county and located elsewhere, the December 31, 1957, valuation of machinery and equipment would be reduced accordingly."

In short, the promise was that Steel (and each other company) would continue to pay real estate (property) taxes based upon the inclusion of machinery (at its assessed value) on the books as of December 31, 1957, so long as that machinery remained on the books or was replaced with other units performing the same function. But any such machinery assessment would be reduced by any increase in real estate valuation after December 31, 1957, with the result that there would be no increase in total assessments over the assessment in effect on that date until all value based on machinery had been eliminated.

Each company communicated this commitment to the local taxing authorities, the County Commissioners and the members of the Pennsylvania State Senate.

Frank R. Denton has filed an affidavit which states in part:

"I am Chairman of the Executive Committee of Mellon National Bank and Trust Company. During 1957 I was Vice Chairman of the Board of Directors and Chief Executive Officer of Mellon National Bank and Trust Company. I am also and was then a member of the Board of Directors of Westinghouse Electric Corporation. I am now a member of the Board of Directors of PPG Industries, Inc., formerly Pittsburgh Plate Glass Company. In addition, I was the Chairman of the Regional Industrial Development Corporation of Southwestern Pennsylvania from 1957 until 1967. In 1957 I was in close touch with all six of the industrial companies mentioned below concerning the agreements, also mentioned below, with respect to payment of taxes on machinery and equipment, and in close touch with the Pennsylvania Economy League, Western Division, which at that time was engaged in making studies of comparative tax burdens in Allegheny County, in other parts of Pennsylvania, and in other states and in particular parts of other states."

\* \* \* \* \* \*

"In order to encourage the passage of this legislation, United States Steel Corporation and five other large industrial companies in Allegheny County, Westinghouse Electric Corporation, Pittsburgh Plate Glass Company, Westinghouse Air Brake Company, Allegheny Ludlum Steel Corporation and Blaw-Knox Company, agreed that in the event H.B. 797 became

law, they would continue to pay taxes on existing machinery and equipment, with new machinery and equipment to be excluded from taxation. I was aware of, and encouraged, the development of the plan of the six companies. In my opinion the companies acted to obtain a half loaf where failure to act would have meant no loaf at all."

\* \* \* \* \* \*

"After the Pennsylvania House of Representatives passed H.B. 797, I talked with Senator Robert D. Fleming, who was Majority (Republican) Caucus Chairman in the Pennsylvania Senate, concerning H.B. 797. I assured him that the six companies would honor their commitments and would not break faith with the communities, with the legislators or with each other. If any of the companies had broken faith, it would have caused formidable repercussions, including new legislation, new assessments and ill will with communities, the other companies, and local customers and suppliers."

On June 14, 1957 a vice-president of U. S. Steel wrote to Senator Fleming as follows:

"We refer to House Bill 797 relating to the exemption of machinery and equipment from property taxes in Allegheny County, which bill is pending in the Senate. In recent weeks representatives of United States Steel Corporation have been in touch with representatives of the following Monongahela River communities, namely, Clairton, Duquesne, Homestead, McKeesport, Munhall, North Braddock, North Versailles, Rankin, West Homestead, and West Mifflin, to discuss the implications of this pending legislation on the future revenues of these communities. It is certainly not the intent of United States Steel to support any legislation which would result in imposing unreasonable financial burdens or upset existing revenue structures in these communities. Accordingly, this Corporation has made definite proposals to those communities, which proposals would, of course, apply to all communities in Allegheny County in which United States Steel has operations, that we will continue paying property taxes on all machinery and equipment on the tax rolls as of December 31, 1957, until such equipment should be retired or replaced in future years. The taxes on the existing machinery and equipment would be in addition, of course, to taxes on real estate. Our proposal has been made with the further understanding that any acquisitions of machinery and equipment occuring on and after January 1, 1958, would be exempt from tax. We made this proposal to these communities believing it to be a fair and equitable solution to the problem presented by House Bill 797, which as you know, provides for the elimination of the present tax on machinery over a five-year period beginning in 1958.

It is our feeling that while House Bill 797 is certainly desirable in principle in so far as it seeks to correct a situation which results in Allegheny County being non-competitive with other counties, we can see that by a strict application of the legislation some hardships might result to the various communities whose revenues have been provided in substantial amounts by the tax on machinery and equipment and the proposal which we refer to above has been made in order to insure that no hardship would result. We wanted you to know that this offer has been made on behalf of United States Steel Corporation with the full intent that it would be honored should House Bill 797 be enacted into law."

H.B. 797 was thereafter passed by the Senate and Governor Leader signed it.

After H.B. 797 became law Steel continued to make payments to Allegheny County and the local taxing agencies in accordance with its commitment The other major companies did the same thing. "Tax assessments" were prepared by the

authorities and "bills" were sent. Payments were then made. All of the monies which Steel so paid to the governmental agencies in the years 1958 through 1967 were treated as "taxes" and included with other local tax items in the corporation's reports to stockholders, were recorded as taxes on all of its books and records, and were treated as deductions in computing income and franchise tax obligations. The 1968 payments, made pursuant to the commitment, totaled about $4,200,000. (In the complaint plaintiffs allege the payments totaled more than $29,000,000.)

Clifford F. Hood, President of United States Steel in 1957, states that the Company had two basic interests in making the commitment: to save taxes for the Corporation in the future, and to make Allegheny County competitive with other counties which did not tax machinery and equipment. And in his affidavit Mr. Sloan states that the Company "would have paid approximately $61 million more in taxes during the period 1958–1967, inclusive, than it actually paid" had H.B. 797 not become law. Mr. Sloan also states:

"From 1957 until the present time, United States Steel Corporation and, to the best of my information, knowledge, and belief, the five other companies have honored their commitments either in the form given in 1957 or as subsequently modified by mutual consent for the purpose of simplifying its application and administration."

\*   \*   \*   \*   \*   \*

"The decision to make the commitments in 1957 was based upon the best business judgment of all of us who participated in that decision, and was supported by the opinion of eminent counsel \*   \*   \*."

\*   \*   \*   \*   \*   \*

"In the years following the enactment of HB 797, United States Steel activated a vast modernization and expansion program of its facilities in Allegheny County. The commitment has worked well for United States Steel. As above indicated, very substantial tax savings have been effected. The tax revenues of the various communities and school districts have been protected and out of the discussions and negotiations with them a better relationship has developed. So far as United States Steel is concerned, the 1957 arrangement has been a beneficial decision and there appears no reason why it should not continue to work out to our mutual benefits in the future."

And Mr. Denton states that Allegheny County is now economically healthful and the enactment of H.B. 797 was a "major factor" in contributing to this.

## II

I first consider plaintiffs' motion to strike, in whole or in part, affidavits filed by Steel. Defendants have filed many affidavits and the motion cuts into and across the body of almost all of them. But two special targets are the affidavits of George. M. Leader and Robert D. Fleming.

Governor Leader was the Governor of Pennsylvania when H.B. 797 was enacted. His affidavit states that in the absence of commitments given by the six companies he would have vetoed the Bill. The statement is offered by Steel to show just that: without the commitment which its officers made, the Bill would not have become law. And Steel argues that the action of a governor upon a bill may be considered in determining legislative intent.

Assuming that principle is sound, it is applicable only when a statute is ambiguous and construction is required. H.B. 797 is clear and unambiguous, M. P. Acee Co., Inc. v. Allegheny County, 18 Pa. Dist. & Co.2d 449 (1958), and I do not understand defendants to contend otherwise. But their real purpose is to supply a condition to Governor Leader's approval of the Bill or to show his motives in signing. They may not do either.

■ As to a condition, there is none in the statute and parol evidence is not admissible to supply one. 30 Am.Jur.2d, Evidence, § 1027. And as to motive, it has been held by a Pennsylvania Court, considering H.B. 797, that evidence cannot be introduced showing that "the legislators, or for that matter the Governor, were influenced by and changed their positions in reasonable reliance upon promises of property owners that they would not seek certain benefits under" the Act. In Re: Appeal of Shenango, Incorporated, 114 P. L.J. 399 (Ct.Common Pleas 1965).

■ I conclude that neither Governor Leader's intent nor his motive in approving H.B. 797 may be offered in this case. It follows that the motion to strike his affidavit must be granted.

■ Senator Fleming was the Majority Leader in the Pennsylvania Senate. Steel offered his affidavit to show that the commitment by its officers "was needed in order for the legislation to pass the Senate." But the affidavit is subject to the same general infirmities to which I have already referred, and, more importantly, it is well within a recent ruling by the Pennsylvania Supreme Court. In City of Philadelphia v. Depuy, 431 Pa. 276, 244 A.2d 741 (1968) that Court said of testimony by a former State Senator, "as to his own recollection of the events surrounding the passage of * * * [an] act * * *" that "There can be no doubt * * * this testimony was both irrelevant and improper."

Senator Fleming's affidavit will also be stricken.

As to the remaining affidavits, it would burden this opinion beyond reason to discuss each of them in terms of the general arguments made. In deciding the motion for summary judgment, I have not considered any affidavits or parts thereof to

which plaintiffs' motion was directed, except the affidavits of Mr. Sloan. As to those, plaintiffs' motion will be denied, to the extent they are referred to herein. (And I note that much of what is in the affidavits is included in Mr. Sloan's deposition taken by plaintiffs.) As for the balance of the affidavits, counsel are entitled to a ruling and, to establish one, plaintiffs' motion to strike will be granted.

### III

I now turn to defendants' motion for summary judgment. On the merits of the case plaintiffs argue that: (a) it is against public policy to pay monies to a public treasury in return for favorable legislation; (b) reporting the payments to stockholders as "local taxes" is a fraud; (c) the business judgment rule does not apply; and (d) the payments were made neither as a contractual obligation nor as a contribution.[3]

### A.

■ The primary attack by plaintiffs is upon the public policy aspect of Steel's conduct. They say that the Corporation engaged in what amounted to illegal lobbying by conditionally promising to pay monies to public treasuries in return for the enactment of favorable legislation. Therefore, plaintiffs argue, the payments are against public policy, which is another way of saying they are illegal. Restatement, Contracts, § 512. Since both the promise and the payments (performance) were made in Pennsylvania, the law of that State applies.

■ It is well established in Pennsylvania that an agreement which violates or contravenes public policy will not be enforced. Kuhn v. Buhl, 251 Pa. 348, 96 A. 977 (1916). But we are not concerned with what a Pennsylvania court would do

3. At this point I should recognize defendants' argument that plaintiffs have failed to show any loss by the Corporation. The answer to that, of course, is

that if plaintiffs are right all payments made to the Allegheny County communities since 1962 are "waste" and therefore loss to the Company.

once it determined that a given contract or agreement violated public policy. The question, rather, is, did Steel's conduct violate public policy? In the words of *Kuhn,* is the conduct "reprobated by public policy"? And that is a question of law for the Court to determine from all the circumstances of the case.

Plaintiffs cite numerous cases to show that what Steel did violated public policy.[4] But none of them supports that proposition. The cases hold, for example, that an agreement by which an attorney's compensation depends upon his success in getting a prison sentence commuted, or a criminal charge dropped, is against public policy; and so is a contract under which a party is to be paid if he obtains Government business. The cases hold that an agreement to use one's influence to obtain a contract on a public building is against public policy, as is an agreement to eliminate competition for a public advertising contract.

These and similar cases involving Pennsylvania public policy condemn improper tampering with public officials, the use of secret means to obtain a public contract, and the exertion of personal influence for that purpose. But the short of it is that no such conduct is involved here.

Plaintiffs rely particularly upon Board of Education of Borough of Lawnside v. Haddon Farms, 128 N.J.L. 306, 25 A.2d 905 (1942). In that case private citizens of the Borough of Lawnside protested to the New Jersey Legislature about a bill which would affect the Borough; Haddon Farms, a land developer, wanted the bill passed. Its representatives met with the protestants and promised to pay certain outstanding school bonds if the protests were withdrawn. They were, the legislation was enacted, Haddon Farms paid the bonds in part but then refused to pay the balance. The Court held that the contract was designed to influence legislation for a price and would not be enforced.

*Haddon Farms* involved a completely private arrangement between two "sides" with interests for and against proposed legislation. For a negotiated price one side agreed to withdraw opposition. This case, however, has no aspects of a private arrangement to exclude opposition to proposed legislation. On the contrary, the record, including that made by plaintiffs, clearly and abundantly demonstrates that what Steel did was direct and open in all respects. In communications to the Governor, to legislative leaders, to local government officials, and in public meetings of various kinds officers of Steel stated the Corporation's position clearly and unequivocably. They stated what they would do if H.B. 797 were enacted. And nothing was done by the Company to suppress free public expression to the legislature; indeed, a reasonable inference from all that happened is that H.B. 797 was passed and approved by a fully informed Senate and Governor.

Finally, the mere fact that Steel promised to make the payments to the local communities if the legislation were passed did not violate public policy. Compare Electric Plaster Co. v. Blue Rapids City Tp., 77 Kan. 580, 96 P. 68 (1908); 13 A.L. R. 734. Certainly there is Delaware precedent for the enactment of legislation at the request of a citizen who promises financial aid for a public purpose. Clendaniel v. Conrad, 3 Boyce 549, 83 A. 1036 (1912).

In sum, an agreement or promise will not be condemned as being against public policy unless it is clearly contrary to what the legislature or judicial decision has declared to be public policy. Kuhn v. Buhl, supra; 17 Am.Jur.2d, Contracts, § 178. I

---

4. Ormerod v. Dearman, 100 Pa. 561 (1882); Peyton v. Margiotti, 398 Pa. 86, 156 A.2d 865 (1959); Kribbs v. Jackson, 387 Pa. 611, 129 A.2d 490 (1957); Crooks Estate, 316 Pa. 285, 175 A. 410 (1934); Borden v. Ellis, 158 Pa.Super. 259, 44 A.2d 530 (1945); Providence Tool Co. v. Norris, 2 Wall. 45, 69 U.S. 45, 17 L.Ed. 868 (1865); Ewing v. National Airport Corporation, 115 F.2d 859 (4 Cir. 1940).

find nothing in the *Haddon Farms* decision or the Pennsylvania cases to indicate that U. S. Steel's conduct was against public policy.[5]

### B.

I now consider plaintiffs' contention that reporting the payments to stockholders as "local taxes" paid is a fraud. The nature or character of the payments is discussed in more detail hereafter but, whatever that may be, I do not regard the way of reporting as fraudulent under the circumstances of the case.

Plaintiffs' purpose is to show that the acts of defendant directors constituted fraud or gross abuse of discretion to the extent that the business judgment rule is not available to them. Plaintiffs' rationale is that the effect of H.B. 797 was to "eliminate the machinery *taxes*" and since the Corporation reported the payments as taxes such reports were incorrect and fraudulent.

Plaintiffs submitted an affidavit by a certified public accountant who stated that, in his opinion, listing of the monies which Steel paid to Allegheny County and the local communities under the heading of "State, local and miscellaneous taxes" in the annual reports to stockholders was not in conformity with generally accepted accounting principles. That may be. But for present purposes the test is not whether the reporting was in accordance with generally accepted accounting principles but rather whether, under all the evidence, the reporting was fraudulent.

■ Of course directors owe a duty to honestly disclose all material facts when they undertake to give out statements about the business to stockholders. Hall v. John

F. Isaacs and Sons Farms, 37 Del.Ch. 530, 146 A.2d 602 (1958). But by virtue of the mechanics actually used in this case the payments made by Steel to the local communities were in the "form of taxes." This is to say that the local authorities made assessments as they had theretofore before 1957 and billed Steel based upon those assessments. In short, the Corporation received "tax bills" and paid them. And there is not a shred of evidence to show that this procedure was adopted for sinister reasons.

■ Under the circumstances, reporting the payments to stockholders in the form in which they were actually made I do not regard as fraudulent. Certainly plaintiffs have made no showing that there was any purposeful effort on the part of any defendant to conceal the true nature of what was done from the stockholders. I have already alluded to the widespread publicity which accompanied the arrangement pursuant to which the monies were actually paid; so it is reasonable to infer that the purpose for which the monies were spent was well known. The way in which the payments are reported to the stockholders is a detail without legal significance in the present case. Compare Toebelman v. Missouri-Kansas Pipeline Co., 41 F.Supp. 334 (D.Del.1941).

### C.

I now turn to plaintiffs' contention that the Board of Directors should have known of the commitment by the Corporation and should not have allowed the payments to be made or to be reported to stockholders as local taxes paid. Plaintiffs' purpose again, is to deny to defendants the benefit of the business judgment rule. I have already determined that the payments made

5. There is some doubt as to whether *Haddon Farms* is followed in Pennsylvania. In Appeal of J. C. Grille, Incorporated, 181 Pa.Super. 456, 124 A.2d 659 (1956), the Court noted that case, but refused to say that an agreement to withdraw opposition to a proposed zoning ordinance, in exchange for a restrictive covenant by the landowners, violated public policy.

The Court looked at the agreement, saw what it did and found the "whole spirit expressed * * * affirmatively beneficial * * *." That was the test. And applying it here, certainly what Steel did was beneficial to Allegheny County and the Communities as well as to itself.

were not against public policy and there was no fraud involved in the way in which they were reported to stockholders.

The record shows that the commitment on behalf of the Corporation and the making of payments thereunder were considered and approved in 1957 by Mr. Hood, then the President, Chairman of the Executive Committee, and a Director; by Robert C. Tyson, Chairman of the Finance Committee and a Director; by George Rooney, Executive Vice President; by L. C. Simmons, Vice President—Accounting; by William L. Hearne, who was in charge of the Tax Division; and by Mr. Sloan, an attorney in the Tax Division. Board approval was not sought for the commitment or payments, at least prior to the time that this lawsuit was filed. Indeed, most if not all of the directors, other than those whose names I have stated, were unaware of the commitment and/or the payments until after the complaint was filed.

Plaintiffs' point is that other directors were either indifferent to the commitment and the payments, or that they abused their discretion to the point of negligence by allowing executive management of the Corporation to do what it did.

As to the director defendants who did not participate in the decision or who were unaware that the payments were made, plaintiffs offer no evidence to support the argument that those defendants knew or had reason to know of what was done. With respect to Roger Blough, his testimony as to having "possibly" read about the situation in the Pittsburgh papers in 1957 is not sufficient to put him into a different category.

Turning to the directors who were informed about the commitment and the payments, plaintiffs seem to argue that they were without authority to do what they did, or that they should have sought Board approval. The payments that Steel has been making annually are substantial and in the aggregate amount to an enormous sum. At first blush it may seem surprising that approval of the commitment and the payments was not up to the Board. But, in my judgment, absence of such a request points up Steel's vast operations, not the carelessness or indifference of its management. Mr. Blough, the Board Chairman, stated in his deposition:

"I believe that our total tax bill annually, well, it varies from year to year, and, of course we pay large amounts of federal taxes but I think our total local and state tax bill must run well over $100 million and must involve matters that would certainly run into the many hundreds of different separate situations. It simply wouldn't be practical for the board to review intimately every time an attempt is made to reduce taxes.

In short I am persuaded that the magnitude of Steel's operations requires substantial delegation. And that is as permissible in law as it is necessary in fact. Compare Graham v. Allis-Chalmers Manufacturing Company, 41 Del.Ch. 78, 188 A.2d 125 (1963). The extent of such delegation within the U. S. Steel complex is shown by the fact that the management executives who made the commitment undoubtedly believed that they had authority to do what they did. Subsequent Board action confirmed this. I cannot find from the record that the non-participating directors either knew of the commitment or that they should have known about it. And I cannot say that the broad managerial delegation adopted by Steel as a business judgment is wrong as a matter of law because it permitted management to do what was done here.

IV

I have thus far determined that neither Steel's commitment to pay nor its payments violated public policy, and that defendants are not precluded from relying on the business judgment rule. But we deal here with a charge of waste of corporate assets. Payments were made and it is not enough to say that they were not made in viola-

tion of public policy. A key question remains. What rationale supports or permits the payments? Do they have a legal nature or character which prevents them from being a "waste"? On this question Steel offers several hypotheses. It says, of course, that the payments were taxes, that they were made pursuant to a contract, and that they were gifts for the public welfare.

### A.

The payments were made in Pennsylvania to local governments and, to get at the problem, I turn to decisions in that State. There are two reported cases involving H.B. *797*: M. P. Acee Co., Inc. v. Allegheny County, supra; and In Re: Appeal of Shenango, Incorporated, supra.

*Acee* was a mandamus action against the Board of Property Assessment, Appeals and Review of Allegheny County, and the Court said this about the statute here involved:

> " * * * we are convinced that the board does not possess the power to refuse, diminish or interfere with the 20 percent reduction of the assessed valuation of machinery, tools, appliances and other equipment taxable heretofore on the basis of 100 percent of the assessed valuation, and that it was the mandatory duty of defendant to present plaintiffs a bill for 80 percent of the assessed valuation, and when it presented plaintiffs a bill for 100 percent of the assessed valuation, defendant was acting beyond the scope of its authority and power."

The Court went on to hold that reduction in the assessment was mandatory, with no room for discretion in the Board. In short, it held that the reduction in assessment is not really an exemption: it is nonexistent for all tax purposes.

In *Shenango* the Court followed *Acee*, noting that the Board had a mandatory duty to adjust assessments in accordance with the Act. The Court went on to hold

that in Pennsylvania all taxation is statutory, saying:

> "If any specific portion of the property is not taxable (and there can be no doubt that machinery, etc., was not taxable under any statute of the Legislature when the assessments were made in the instant case), the taxing officers are without warrant of law to impose and collect the tax on the non-taxable part, and their official acts are as void as to that part of the property as they would be if the taxes had been illegally levied against his entire holdings. Pittsburgh, Allegheny and McKees Rocks Ry. Co. v. Stowe Township, 252 Pa. 149, pp. 155, 156 [97 A. 197] (1916). 'The Legislature must be intended to mean what it has plainly expressed and it matters not, in such a case, what the consequences may be." Orlosky v. Haskell, supra [304 Pa. 57], p. 62 [155 A. 112].

> "Finally, we repeat, taxes 'can be collected in no other way than that pointed out by the statute, and cannot be collected until they have first been assessed according to the statute * * *', and ' * * * taxation is purely for the legislature. The judiciary can enforce it only as the legislature directs it to be enforced.' Urban Redevelopment Condemnation Case, supra [406 Pa. 6], pp. 13, 14 [178 A.2d 149].

> "Since there was no tax statute providing for the assessment of taxes on machinery, etc., when the purported taxes were assessed against the appellant, the assessments were null and void and of no legal effect."

██ Only one conclusion is reasonably possible from these decisions: taxing authorities in Allegheny County are without legal power to make an assessment upon Steel's machinery. In light of that, the Board does not have authority under the law to make such assessment, to submit a bill based upon it or to collect "taxes" predicated on it. It follows that the pay-

ments here involved cannot be justified as "taxes."

### B.

As I have indicated, defendants argue that they were contractually bound to make the payments, but I am not persuaded by that approach; there is either an absence of consideration, or of a promisee who could enforce the contract, or there is insufficient (or no) evidence to show reliance by the Governor or the legislature on Steel's promise.[6]

In the last analysis, it seems to me that what the Corporation has been doing, in a legal sense, is making donations to the local communities. The Company has a procedure which it follows in making gifts, and apparently those which exceed $500,000 require Board approval. The procedure was not followed nor was Board approval given, but for a very simple reason: the payments were not considered by the Company to be gifts. But that is not a controlling factor. Nor are the form requirements of the Internal Revenue Code or the Commissioner's Regulations.[7]

The payments were permissible corporate disbursements under the law of both New Jersey and Delaware. As to the latter, our statute specifically permits a corporation to make "donations for the public welfare."[8] And the New Jersey Supreme Court has held that a corporation domiciled in that State has implied power under common law principles to make a donation upon a "reasonable belief that it would aid the public welfare

and advance the interests of the * * * private corporation and as part of the community in which it operates." A. P. Smith Mfg. Co. v. Barlow, 13 N.J. 145, 98 A.2d 581, 39 A.L.R.2d 1179 (1953).

But to call these payments "donations" is not to say that they were made out of corporate *largess* or that they were accompanied by only the most general of corporate purposes. On the contrary, they were *in the nature of a subvention, or a payment in lieu of taxes*; they were made with a recognition of Steel's responsibility to the communities in which it was established and of its self-interest in having H.B. 797 remain unaltered on the statute books. On the latter point, the payments were at least reasonably incidental to the carrying on of the Company's business for its benefit, and they meet a New Jersey test argued by plaintiffs. *Hutton v. West Corp. Ry.*, 23 Ch.D. 654 (1883).

Annually the payments approximate $5,000,000, and that is an enormous sum by almost any test. But that does not mean that it is unreasonable. To determine that, the figure must be weighed, not in the abstract, but rather against such factors as (without any order of priority) the amounts Steel had been paying in local taxes, the amounts which it could expect to save without an assessment on existing machinery, the amount it could expect to save without an assessment on new machinery which it planned to install, and the extent to which the communities were dependent upon payments by Steel.[9] By those tests the amounts paid were not unreasonable. As to savings, Mr. Sloan's affida-

---

6. The affidavits of Governor Leader and Senator Fleming are to be stricken and are therefore not available to defendants on the motion for summary judgment.

7. Since the payments were recorded as "taxes" the Corporation has had the advantage of tax deductions for them.

8. 8 Del.C. § 122(9) authorizes a Delaware corporation to: "Make donations for the public welfare or for charitable, scientific or educational purposes, * * *."

9. The communities' dependence upon Steel was likewise enormous. Mr. Sloan testified on deposition, for example, that in 1957 Steel's machinery represented the following *percentages of the total* assessment: in Clairton 54%, Duquesne 35%, Homestead 33%, Munhall 30%, West Homestead 28%, West Miflin 15%, Rankin 47%, McKeesport 15%, North Bradford 50%.

vits show that "tax savings" to the Corporation for the years 1958–1968, inclusive, amount to some $72,000,000 net of payments to the local communities. Plaintiffs have challenged in general terms the reliability of Steel's figure but that is directed more to the computation of taxes paid than to the savings which Steel contends resulted. In any event, plaintiffs' affidavits are not in such detail as to fairly create a factual dispute for present purposes.

## V

For reasons which I have already stated, I reject plaintiffs' argument that defendants are not entitled to the benefit of the business judgment rule. The Rule is commonly applied to directors and was stated by our Supreme Court in Warshaw v. Calhoun, Del.Ch., 221 A.2d 487 (1966) as follows:

"In the absence of a showing of bad faith on the part of the directors or a gross abuse of discretion the business judgment of the directors will not be interfered with by the courts."

Steel was a New Jersey corporation until January 1, 1966, but plaintiffs do not contend that the law of that State is any different than our own on this issue. It appears to be the same. Ellerman v. Chicago Junction Railways & Union S. Y. Co., 49 N.J.Eq. 217, 23 A. 287 (1891).

■■■ Under the circumstances of this case, and particularly in the absence of any suggestion of divided loyalty, the Rule is applicable to the executive officers of Steel who made the commitment to the communities and who authorized the payments to them. 3 Fletcher, Cyclopedia, Corporations (Perm.Ed.) § 1039. The commitment and the payments to the Allegheny County communities involved the exercise of a business judgment which will not be interfered with by this Court.

Defendants' motion for summary judgment will be granted.